# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 16, 2012 Session

## CHRISTIAN HEYNE ET AL. v. METROPOLITAN NASHVILLE BOARD OF PUBLIC EDUCATION

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
**No. 09-136-III      Ellen Hobbs Lyle, Chancellor**

---

**No. M2010-00237-SC-R11-CV - Filed September 27, 2012**

---

This appeal involves the scope of the procedural due process rights of a public high school student facing discipline for an infraction of school rules of conduct. After injuring a younger student with his automobile on school property, the student was cited for an infraction of the student conduct rule proscribing reckless endangerment. The principal's decision to suspend the student for ten days was upheld by a hearing board and a designee of the director of schools, and the school board declined to review the matter. Thereafter, the student and his family filed a petition for common-law writ of certiorari in the Chancery Court for Davidson County seeking judicial review of the disciplinary decision. Following a hearing during which the trial court permitted the student and his family to present evidence regarding allegedly arbitrary, capricious, and illegal conduct by school officials that was not reflected in the record of the disciplinary proceedings, the trial court found that the school officials had violated the student's procedural due process rights because one official had performed both prosecutorial and decision-making functions and because this official was biased against the student. The trial court also determined that the evidence did not support the conclusion that the student's conduct amounted to reckless endangerment. Accordingly, the trial court directed the school system to expunge the student's record and awarded the student and his family $371,845.25 in attorneys' fees and $25,626.27 in costs. The Board of Education appealed, and the Court of Appeals reversed the trial court's judgments. *Heyne v. Metropolitan Nashville Bd. of Pub. Educ.*, No. M2010-00237-COA-R3-CV, 2011 WL 1744239 (Tenn. Ct. App. May 6, 2011). We affirm the judgment of the Court of Appeals.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and SHARON G. LEE, JJ., joined.

Philip N. Elbert, Jeffrey H. Gibson, and Meghan C. Dougherty, Nashville, Tennessee, for the appellants, Christian Heyne, William Heyne, and Robin Heyne.

Wm. Michael Safley, Deputy Director of Law; J. Brooks Fox and Christopher M. Lackey, Assistant Metropolitan Attorneys, Nashville, Tennessee, for the appellee, Metropolitan Nashville Board of Public Education.

Richard L. Colbert and Courtney L. Wilbert, Franklin, Tennessee, for the Amicus Curiae, Tennessee Education Association.

Randall G. Bennett and Joel H. Moseley, Jr., Nashville, Tennessee, for the Amicus Curiae, Tennessee School Boards Association.

Charles W. Cagle and Angela C. Sanders, Nashville, Tennessee, for the Amicus Curiae, Tennessee Organization of School Superintendents.

**OPINION**

**I.**

This dispute arises from an incident that occurred on Friday, September 5, 2008, at Hillsboro High School in Nashville. Following an afternoon film session for the varsity football team, several groups of players had assembled in a narrow parking lot behind the locker room to talk about their plans for the weekend and to wait for their rides home.

Christian Heyne, an eighteen-year-old senior and co-captain of the football team, was standing with one group of players when he overheard his name mentioned by another group of mostly freshman football players. Mr. Heyne believed that the freshman players were joking about him. Mr. Heyne got into his Lexus automobile, rolled down the windows, and turned on his music "a little bit." Then he pulled up to another player's parked automobile. Following a brief conversation with the other player, Mr. Heyne put his automobile in reverse and backed up in preparation to leave the parking lot. The group of freshman players were standing between Mr. Heyne and the exit. Instead of coming to a complete stop after backing up, Mr. Heyne shifted directly from reverse to drive, causing his automobile to lurch forward in the direction of the group of freshman football players.

The freshman players quickly scattered to get out of Mr. Heyne's way because two days earlier, Mr. Heyne had swerved his automobile toward two freshmen, forcing them to jump out of the way. All of the freshman players were able to get out of the way of Mr.

Heyne's automobile except for Denzel A.[1]  Mr. Heyne eventually brought his automobile to a stop, but not before the left front tire of his automobile pinned Denzel A.'s foot, causing Denzel A. to fall down.

Mr. Heyne backed up and stopped his automobile.  He got out and approached Denzel A. to find out if he was hurt.  Denzel A. was upset and, according to several bystanders, threatened Mr. Heyne.  Mr. Heyne returned to his automobile and drove away, but in the process, he ran over Denzel A.'s backpack that had fallen under Mr. Heyne's automobile.

While at least one parent witnessed the incident, no coaches or other school officials were present.  After Mr. Heyne drove away, Denzel A. and six other students found Roderick L. Manuel, Hillsboro High School's principal, in his office and described the incident to him.  Mr. Manuel placed a telephone call to William Heyne, Mr. Heyne's father, but was told that he was out of town.  When Mr. Manuel learned that Mr. Heyne's father was out of town, he discussed the incident with Robin Heyne, Mr. Heyne's mother.

Mr. Manuel also requested Denzel A.'s parents to come to the school.  Denzel A.'s parents picked up their son at school and took him to the emergency room at Vanderbilt Children's Hospital.  X-rays were taken, and the attending physician diagnosed Denzel A.'s injuries as a contusion and an ankle sprain.  Denzel A.'s parents also notified the police about what had happened to their son.  The police instructed them to consult with the school resource officer.  Denzel A.'s parents returned to the school on Monday, September 8, 2008, to speak with the school resource officer about the incident.

Mr. Heyne was a high-profile student at Hillsboro High School, and his parents were very active in activities at the school.  Mr. Manuel met with Mr. Heyne and his father on Monday, September 8, 2008.  When Mr. Manuel asked Mr. Heyne to write down his version of the incident, Mr. Heyne's father handed Mr. Manuel a written statement that his son had already prepared.  Mr. Heyne's father also provided Mr. Manuel with the written statements of two other students that Mr. Heyne's mother obtained following the incident.  Mr. Manuel informed Mr. Heyne and his father that he would continue to investigate the incident and that he would contact them at a later date.  He also instructed Mr. Heyne to refrain from bringing his automobile onto the campus.  Mr. Heyne and his father agreed to this request.

On Tuesday, September 9, 2008, Mr. Manuel met again with Mr. Heyne's father and later in the afternoon with both of Mr. Heyne's parents.  During the first meeting, Mr. Heyne's father suggested that his son was merely hazing the freshmen.  Mr. Manuel told Mr.

---

[1]Because these events occurred when Denzel A. was a juvenile, we will not use his surname in this opinion.

Heyne's parents that he was attempting to obtain a statement from a parent who had witnessed the incident. Mr. Manuel also suspended Mr. Heyne for two days pending further investigation.

Mr. Manuel continued to gather information about the incident. On September 11, 2008, after consulting with officials at the central office of the Metropolitan Nashville Public Schools ("MNPS"),[2] Mr. Manuel determined that Mr. Heyne's conduct violated three provisions of the Student-Parent Code of Conduct and Handbook.[3]

Based on his investigation and his assessment of the seriousness of Mr. Heyne's infractions of the rules, Mr. Manuel finally decided that Mr. Heyne should receive a ten-day out-of-school suspension.[4] However, because the Student-Parent Code of Conduct and Handbook required infractions of Rule 4, Code 44 to "be referred to a disciplinary coordinator and could lead to possible expulsion," Mr. Manuel notified Mr. Heyne's parents by telephone and in writing that they had a right to request a hearing with regard to their son's disciplinary infractions and his punishment. Mr. Manuel's written notice to the Heynes stated that they could request a hearing regarding their son's decision by contacting Fran Perry, the Coordinator of Student Disciplinary Referrals assigned to Hillsboro High School.

Mr. Heyne's parents appealed Mr. Manuel's decision. A hearing was held on September 23, 2008, before a four-person hearing board.[5] Ms. Perry convened and presided

---

[2]Mr. Manuel discussed this matter with Assistant Superintendent of Schools James Briggs, Director of Attendance and Discipline Alvin Jones, and Fran Perry, the Disciplinary Coordinator assigned to Hillsboro High School.

[3]Mr. Manuel determined that Mr. Heyne's conduct amounted to (1) reckless endangerment in violation of Rule 1, Code 8; (2) driving his automobile in a threatening/assaultive manner in violation of Rule 4, Code 44; and (3) cruelty/abusiveness to a student in violation of Rule 9, Code 66. On the notice of disciplinary action, Mr. Manuel also stated: "Reckless endangerment. Endangering the lives of fellow students with a vehicle. Several witnesses support the allegation that Christian used his vehicle in a reckless manner. A student was injured as a result of his reckless driving on campus."

[4]According to the Student-Parent Code of Conduct and Handbook, "[d]isciplinary action may occur at the school level and the central office level." Principals have the authority to impose discipline up to a ten-day suspension. Tenn. Code Ann. § 49-6-3401(c)(2) (Supp. 2011). However, if the principal determines that a particular infraction warrants expulsion or that a suspension of longer than ten days is warranted, the student's parents or guardians must be given an opportunity to appeal the principal's decision. Tenn. Code Ann. § 49-6-3401(c)(4)(B).

[5]The board included Ms. Perry; Dr. Shuler Pelhan, the executive principal of John Overton High School; Roosevelt Sanders, Jr., an assistant principal at Glencliff High School; and Cindy Minnis, a school
(continued...)

-4-

over the hearing. During this hearing, the attorneys retained by the Heynes presented a letter arguing their clients' case, along with 135 pages of witness statements, character references, and other documents. Mr. Heyne's father was also permitted to address the hearing board and to question Mr. Manuel.[6] During this hearing, Mr. Heyne's father characterized the incident as "just a negligent accident that happened."

At the conclusion of the hearing, the hearing board, consistent with the Student-Parent Code of Conduct and Handbook, deliberated behind closed doors. Following their deliberations, Ms. Perry announced that she and the other board members had unanimously concluded that Mr. Heyne's conduct amounted to reckless endangerment in violation of Rule 1, Code 8 and that the ten-day suspension that Mr. Heyne had already served, coupled with probation for the remainder of the school year, was appropriate punishment for the infraction.

On September 24, 2008, Ms. Perry and the MNPS Director of Attendance and Discipline sent a letter to Mr. Heyne's parents informing them of the results of the hearing. This letter stated that the hearing board had found:

1.  That Christian drove his vehicle into a crowd of 9th grade football players who were milling around on a school parking lot.
2.  That all but one of the students scattered out of the path of the vehicle.
3.  That one of Christian's wheels rolled onto the student's foot/ankle.
4.  [That] [t]he student's foot/ankle was injured.
5.  That Christian's behavior was reckless.

The letter also informed the Heynes of the conditions of their son's probation and informed them that they had the right to appeal the hearing board's decision to the Director of Schools or the Director's designee.

---

[5](...continued)
psychologist and guidance counselor.

[6]The Student-Parent Code of Conduct and Handbook states explicitly that "[t]he student may speak in his/her own behalf and may be questioned on his/her testimony." Accordingly, the attorneys retained by Mr. Heyne's parents were permitted to attend the hearing but were not permitted to actively participate in the hearing.

The Heynes pursued their second administrative appeal, which was heard by Mary Chambers, MNPS Discipline Coordinator and the Director's designee. In a lengthy letter setting out the Heynes' arguments, their lawyers set forth their version of the facts, extolled Mr. Heyne's accomplishments, complained about procedural irregularities in the proceedings, and even argued that "these proceedings may have been improperly influenced by the parents of the fellow student who claims to have been injured by Christian, who are demanding that large sums of money be paid by Christian's family."

The hearing before Ms. Chambers took place on October 27, 2008. Mr. Heyne, his father, and the Heynes' lawyers actively participated in this hearing. In addition to the already voluminous administrative record, they submitted 163 pages of documents to Ms. Chambers. Mr. Heyne gave his version of the September 5, 2008 incident and began to address the similar incident that had occurred two days earlier on September 3, 2008, until his father interrupted him, saying "You're getting off the point here."

On October 30, 2008, Ms. Chambers notified Mr. Heyne's parents by mail that she concurred with the findings of the hearing committee and supported their recommendations. Thus, she sustained Mr. Heyne's ten-day suspension and the decision to place him on probation for the remainder of the school year. She also informed the Heynes of their right to pursue a discretionary appeal of her decision to the Metropolitan Nashville Board of Education. Mr. Heyne and his parents appealed to the Board of Education.

A committee of Board members, including the chair of the Board, reviewed the administrative record and reported to the full Board that Mr. Heyne's ten-day suspension and probation were appropriate. Accordingly, on November 26, 2008, the Board of Education denied the Heynes' request to appeal. As a result of the Board's decision, Mr. Heyne's ten-day suspension and probation remained in effect.

On January 22, 2009, Mr. Heyne and his parents filed suit in the Chancery Court for Davidson County. In their original petition and an amended petition filed on April 1, 2009, they asserted that the disciplinary proceedings were arbitrary, capricious, and illegal. They also claimed that the disciplinary proceeding against Mr. Heyne violated his due process and equal protection rights.

The trial court filed an order on August 4, 2009, narrowing the scope of the proceeding to that available under a petition for common-law writ of certiorari. On September 4, 2009, the Heynes filed a second lawsuit against not only the MNPS but also against Mr. Manuel, Ms. Perry, Ms. Chambers, Mr. Jones, and two other school officials in

their official and individual capacities.[7] This complaint, and the amended complaint naming additional defendants filed on September 10, 2009, sought injunctive relief and compensatory and punitive damages against the defendants for violating 42 U.S.C. § 1983 and for "their malicious, intentional, or reckless actions in improperly disciplining [Mr. Heyne]."

On October 23, 2009, the Heynes sought permission to file a second amended petition in their original certiorari proceeding. In addition to their request for review of the school system's decision to suspend Mr. Heyne for ten days, the Heynes included an allegation that the Board of Education had violated 42 U.S.C. § 1983 and that they were entitled to reasonable attorneys' fees under 42 U.S.C. § 1988. As a result of the addition of the new claims based on 42 U.S.C. § 1983, the Board of Education gave notice on October 20, 2009 that it was removing the case to the United States District Court for the Middle District of Tennessee.[8]

On November 3, 2009, the Heynes filed an emergency motion requesting the United States District Court to remand the case back to the state courts to enable the trial court to conduct a hearing in accordance with their claim for relief pursuant to a common-law writ of certiorari. On November 10, 2009, the United States District Court remanded part of the case back to the state trial court based on the Heynes' representations "that they do not intend to seek relief in the Chancery Court for constitutional violations or any federal claim."[9] On December 17, 2009, after the case was returned from the United States District Court, the trial court struck any reference to 42 U.S.C. § 1983 from the Heynes' pleadings.

---

[7]These officials were Ralph Thompson, the Assistant Superintendent for Student Services, and Chris Henson, the interim Director of the MNPS.

[8]The Board of Education also removed to federal court the complaint the Heynes filed on September 4, 2009. While the United States District Court later dismissed many of these claims, it declined to dismiss the individual MNPS employees' qualified immunity defense to the Heynes' 42 U.S.C. § 1983 claims. Based on the record in the federal proceeding, the United States Court of Appeals for the Sixth Circuit held that the Heynes' complaint failed to state a 42 U.S.C. § 1983 conspiracy claim and that the school officials' conduct did not violate Mr. Heyne's procedural due process rights. However, the court determined that Mr. Heyne stated a facially valid claim against Mr. Manuel, Mr. Jones, and Ms. Perry for violating his procedural due process rights. *Heyne v. Metropolitan Nashville Pub. Schs.*, 655 F.3d 556 (6th Cir. 2011).

[9]The United States District Court also concluded, in a footnote, that the Heynes "impliedly also represent that they do not intend to pursue any claim in the state court action for attorneys' fees pursuant to 42 U.S.C. § 1988." When the case returned to state court, the Heynes disagreed with the United States District Court's conclusion that they would forego attempting to seek attorneys' fees under 42 U.S.C. § 1988 in the state proceedings.

The trial court conducted a hearing in this case on December 16 through 18, 2009. Over the Board of Education's objection, the trial court permitted the Heynes to present additional evidence regarding alleged illegal, arbitrary, or capricious actions that were not reflected in the official record of Mr. Heyne's disciplinary proceedings. Much of this testimony focused on Ms. Perry's role in the proceeding and on deviations between the manner in which this matter was investigated and resolved and the requirements of the Student-Parent Code of Conduct and Handbook. The Heynes also presented evidence intended to demonstrate that the outcome of the proceeding was influenced by considerations of race, class, and the MNPS's fear of liability.

The trial court filed a lengthy memorandum and order on December 23, 2009. The trial court dismissed the Heynes' substantive due process and equal protection claims. However, the trial court determined that the school system had acted illegally by violating Mr. Heyne's procedural due process right to have his case heard by an impartial decision-maker. Focusing primarily on the hearing board that conducted the first administrative review of Mr. Heyne's discipline on September 23, 2008, the trial court concluded that Ms. Perry "impermissibly performed and combined the functions of prosecutor in the case and decision maker." The court believed that Ms. Perry had acted as a prosecutor because she had selected the disciplinary infractions with which Mr. Heyne would be charged and because she assisted in gathering evidence. The trial court also decided that Ms. Perry was a decision-maker because she was a member of the hearing board that conducted the first administrative hearing and because she actively participated in the board's deliberations.

The trial court also concluded that the record contained other evidence sufficient "to draw an inference of bias and partiality." In the trial court's words:

> The circumstantial evidence in this case . . . is that [Mr. Heyne] was an affluent Caucasian student residing in Green Hills and zoned for Hillsboro High School. He was highly visible on campus as a scholar and football player, and his parents were active, well-known supporters of the school. The other student, [Denzel A.], was not affluent and was not zoned for Hillsboro. He resided in Antioch. Additionally, circumstances from the record are that coaches/adult supervision was not in place when the incident occurred. Further, that [Denzel A.'s] parents, the very night of the incident, had police on the scene and were making reports the following Monday morning with school security raised the spectre of claims of liability or a lawsuit against the School. There are also the circumstances in the record that the respondent maintains statistics on school

-8-

discipline broken down by ethnicity. Those statistics show a higher percentage number of convictions at Hillsboro High School for students of [Denzel A.'s] ethnicity than other ethnic groups which could be characterized as disproportionate enforcement.

The foregoing circumstances of concerns of an appearance of favoritism and lack of supervision at Hillsboro High School . . . are accompanied with proof that this case was handled differently from any other. The proof established that it is the policy of the Vice Principal assigned to a student by alphabet to investigate a disciplinary offense. This was not done in the case of [Mr. Heyne]. Christian Heyne's Vice Principal was excluded from and not consulted in the investigation of the incident whereas [Denzel A.'s] Vice Principal was consulted. Also . . . there were irregularities such as the Central Office, not Principal Manuel, performing the role of prosecutor in deciding the charges. Fran Perry's zeal, testified to by Dr. Pelham, was unusual, out of the ordinary. And . . . the charges against Christian Heyne were out of proportion to and did not fit the conduct.

Based on these conclusions, the trial court determined that "Ms. Perry's combined roles and the circumstances of other motives [MNPS] had in processing the charges against [Mr. Heyne], establish . . . that Ms. Perry was influenced in her role as decision maker by her investment in a conviction due to her prosecutorial work, and concerns about litigation and the appearance of favoritism."

The trial court also concluded that Mr. Heyne's ten-day suspension was illegal because there was no evidence to support it. Even though the court found that the record contained evidence that Mr. Heyne was reckless, it concluded that the record contains "no proof that the risk [of injury resulting from Mr. Heyne's conduct] was substantial, and . . . that the risk was one of death or serious injury." Focusing on Denzel A.'s injury, the court noted that Denzel A. "return[ed] to athletic participation . . . within a week of the incident" and that the team physician had concluded that "it is highly unlikely that serious injury or death could result from the incident." The trial court also noted that the record contained no evidence that Mr. Heyne intended to cause harm.

In its December 23, 2009 memorandum and order, the trial court reserved ruling on the Heynes' claim for attorneys' fees under 42 U.S.C. §§ 1983 and 1988. In an order entered

on January 28, 2010, denying the Board of Education motion to strike the claim for attorneys' fees, the trial court concluded that Tennessee law permitted the recovery of attorneys' fees and costs "in a writ of certiorari case where there has been a deprivation of U.S. constitutional rights under color of state law." Following a hearing on the Heynes' request for attorneys' fees and costs, the trial court filed a memorandum and order on April 30, 2010, awarding the Heynes $371,845.25 in attorneys' fees and $25,626.27 in costs.

The Board of Education perfected an appeal to the Court of Appeals. In an opinion filed on May 6, 2011, the Court of Appeals disagreed with the trial court's finding that Mr. Heyne's due process rights had been violated. *Heyne v. Metropolitan Nashville Bd. of Pub. Educ.*, No. M2010-00237-COA-R3-CV, 2011 WL 1744239, at *9 (Tenn. Ct. App. May 6, 2011), *perm. app. granted* (Sept. 21, 2011). In addition, the Court of Appeals determined that "there is material evidence to support the board's decision and, therefore . . . that the board's decision was not arbitrary." *Heyne v. Metropolitan Nashville Bd. of Pub. Educ.*, 2011 WL 1744239, at *11. Based on its conclusion that Mr. Heyne's due process rights were not violated, the Court of Appeals also found that the Heynes were not entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988. *Heyne v. Metropolitan Nashville Bd. of Pub. Educ.*, 2011 WL 1744239, at *11.

We granted the Heynes' Tenn. R. App. P. 11 application for permission to appeal. In their brief filed in this Court, the Heynes present four issues:

(1) Whether Mr. Heyne's procedural due process rights were violated when Ms. Perry, "motivated by actual bias and prejudice stemming from, among other things, the consideration of the race of the students involved," directed Mr. Manuel to bring serious disciplinary charges against Mr. Heyne, despite the fact that he had not seen fit to bring such charges.

(2) Whether Mr. Heyne's procedural due process rights were violated when Ms. Perry, "motivated by actual bias and prejudice," dictated the charges to be brought against Mr. Heyne, presided over the disciplinary hearing, participated in the deliberations, and improperly influenced the hearing panel's decision.

(3) Whether Mr. Heyne was improperly "convicted" of reckless endangerment when the hearing panel never found that he placed another person at risk of serious bodily injury or death.

(4) Whether the trial court had the authority to award the Heynes their attorneys' fees.

**II.**

We turn first to the standard of review that courts must use when reviewing local public school officials' decisions regarding student discipline. There is no dispute in this case that local school officials have the authority to discipline students in an appropriate manner.[10] While both state law and the Board's policies provide for an elaborate administrative process for the imposition of student discipline, they do not explicitly provide students with a vehicle for seeking judicial review of adverse disciplinary decisions. Thus, in the absence of any other plain, speedy, or adequate method for obtaining judicial review of an adverse disciplinary decision, students, either individually or through their parents, may seek judicial review using a common-law petition for writ of certiorari authorized by Tenn. Code Ann. § 27-8-101 (2000) after they have exhausted all the administrative remedies available to them.

A common-law writ of certiorari is an extraordinary judicial remedy. *State v. Lane*, 254 S.W.3d 349, 355 (Tenn. 2008) (quoting *Robinson v. Clement*, 65 S.W.3d 632, 635 (Tenn. Ct. App. 2001)). The scope of the judicial review available through a common-law writ is quite limited. *Harding Acad. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 222 S.W.3d 359, 363 (Tenn. 2007); *Leonard Plating Co. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 213 S.W.3d 898, 903 (Tenn. Ct. App. 2006).

The reasons for the writ's limitations on the court's ability to review an agency's decision are particularly important in cases such as this one. These limitations are grounded in the doctrine of separation of powers found in Article II, Sections 1 and 2 of the Tennessee Constitution. *See* Ben H. Cantrell, *Review of Administrative Decisions By Writ of Certiorari in Tennessee*, 4 Mem. St. U.L. Rev. 19, 21 (1973). The General Assembly cannot require the Judiciary to perform functions that are not essentially judicial. *In re Cumberland Power Co.*, 147 Tenn. 504, 508, 249 S.W. 818, 819 (1923) (quoting *Muskrat v. United States*, 219 U.S. 348, 352 (1911)). Likewise, the Judiciary may not, on its own initiative, undertake to perform functions that are not necessarily judicial and that have been assigned to other branches of government. *See Hoover Motor Exp. Co. v. Railroad & Pub. Utils. Comm'n*, 195 Tenn. 593, 602, 605-06, 261 S.W.2d 233, 237-38 (1953). Thus, providing the limited sort of judicial review available under a common-law writ of certiorari will guard against the risk that the courts might undertake to exercise power that does not belong to them.

---

[10] *See, e.g.*, Tenn. Code Ann. § 49-2-203(a)(7) (Supp. 2011) (empowering local boards of education to suspend or dismiss pupils when the progress, safety, or efficiency of the school makes it necessary or when disruptive, threatening, or violent students endanger the safety of other students or school system employees); Tenn. Code Ann. § 49-6-3401(a) (empowering principals to suspend students from school).

Creating a climate conducive to learning and maintaining discipline in public schools between kindergarten and the twelfth grade are not judicial functions. The United States Supreme Court has properly observed that public education in our country is, by and large, committed to the control of state and local authorities and that any judicial intervention into the operation of public schools requires "care and restraint." *Goss v. Lopez*, 419 U.S. 565, 578 (1975) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). The care and restraint reflected in the limited standard of review available through a common-law writ of certiorari helps to avoid the risk that the courts will be asked to become super school boards insofar as student discipline is concerned.

The judicial review available under a common-law writ of certiorari is limited to determining whether the entity whose decision is being reviewed (1) exceeded its jurisdiction, (2) followed an unlawful procedure, (3) acted illegally, arbitrarily, or fraudulently, or (4) acted without material evidence to support its decision. *Harding Acad. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 222 S.W.3d at 363; *see also Stewart v. Schofield*, 368 S.W.3d 457, 463 (Tenn. 2012). We have explicitly approved the use of the common-law writ of certiorari to provide judicial relief from (1) fundamentally illegal rulings, (2) proceedings inconsistent with essential legal requirements, (3) proceedings that effectively deny parties their day in court, (4) decisions that are beyond the decision-maker's authority, and (5) decisions that involve plain and palpable abuses of discretion. *State v. Lane*, 254 S.W.3d at 355 (quoting *Willis v. Tennessee Dep't of Corr.*, 113 S.W.3d 706, 712 (Tenn. 2003)). However, we have also held that:

> the common law-writ [of certiorari] . . . may not be resorted to for the correction of technical or formal errors, not affecting jurisdiction or power, or for the correction of defects that are not radical, amounting to an illegality that is fundamental, as distinguished from an irregularity.

*State ex rel. McMorrow v. Hunt*, 137 Tenn. 243, 249, 192 S.W. 931, 933 (1917).

A common-law writ of certiorari proceeding does not empower the courts to redetermine the facts found by the entity whose decision is being reviewed. *Tennessee Waste Movers, Inc. v. Loudon Cnty.*, 160 S.W.3d 517, 520 n.2 (Tenn. 2005); *Cooper v. Williamson Cnty. Bd. of Educ.*, 746 S.W.2d 176, 179 (Tenn. 1987). Accordingly, we have repeatedly cautioned that a common-law writ of certiorari does not authorize a reviewing court to evaluate the intrinsic correctness of a governmental entity's decision. *See, e.g., Stewart v. Schofield*, 368 S.W.3d at 465; *Arnold v. Tennessee Bd. of Paroles*, 956 S.W.2d 478, 480 (Tenn. 1997). Similarly, we have noted that reviewing courts may not reweigh the evidence or substitute their judgment for the judgment of the entity whose decision is being reviewed.

*See, e.g.*, *State v. Lane*, 254 S.W.3d at 355 (quoting *Robinson v. Clement*, 65 S.W.3d at 635); *Harding Acad. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 222 S.W.3d at 363.

In other contexts, we have recognized that the administrative decisions of local public school officials are accompanied with a presumption that they were made in good faith. *See Lawrence Cnty. Educ. Ass'n v. Lawrence Cnty. Bd. of Educ.*, 244 S.W.3d 302, 315 (Tenn. 2007); *Mitchell v. Garrett*, 510 S.W.2d 894, 898 (Tenn. 1974). This presumption of good faith applies in proceedings involving a common-law writ of certiorari. *McCord v. Southern Ry.*, 187 Tenn. 247, 252-53, 213 S.W.2d 184, 186 (1948). Accordingly, parties using a common-law writ of certiorari to challenge an administrative decision of local school officials have the burden of presenting evidence establishing that the officials (1) exceeded their jurisdiction, (2) followed an unlawful procedure, (3) acted illegally, arbitrarily, or fraudulently, or (4) acted without material evidence to support their decision.

A common-law writ of certiorari is not available as a matter of right. *Boyce v. Williams*, 215 Tenn. 704, 713-14, 389 S.W.2d 272, 277 (1965); *State ex rel. Karr v. Taxing Dist. of Shelby Cnty.*, 84 Tenn. 240, 246 (1886). The petition for a writ is addressed to the trial court's discretion. *Biggs v. Memphis Loan & Thrift Co.*, 215 Tenn. 294, 302, 385 S.W.2d 118, 122 (1964); *Gaylor v. Miller*, 166 Tenn. 45, 50, 59 S.W.2d 502, 504 (1933). Accordingly, appellate courts must review a trial court's decision either to grant or to deny a petition for common-law writ of certiorari using the "abuse of discretion" standard of review. *State v. Lane*, 254 S.W.3d at 354.

The "abuse of discretion" standard does not permit an appellate court to substitute its judgment for the trial court's judgment. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). We have recently explained:

> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.
>
> To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the

factual basis for the decision is properly supported by the evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted) ; *see also Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012); *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105-06 (Tenn. 2011); *Elliott v. Cobb*, 320 S.W.3d 246, 249-50 (Tenn. 2010).

## III.

The Heynes assert that the Court of Appeals erred by reversing the trial court's order that vacated Mr. Heyne's ten-day suspension and directing that his official school record be expunged. Accordingly, we must decide (1) whether the trial court abused its discretion by concluding that Mr. Heyne's disciplinary proceeding was fatally tainted by Ms. Perry's acting as both a prosecutor and a decision-maker; (2) whether Mr. Heyne's disciplinary proceeding was fatally tainted by the school officials' individual and collective "bias and partiality" against him; and (3) whether the record contains material evidence supporting the hearing panel's conclusion that Mr. Heyne's conduct on the afternoon of September 5, 2008 amounted to reckless endangerment under Rule 1, Code 8. We have concluded that the Court of Appeals correctly determined (1) that the trial court erred by determining that the dual role Ms. Perry played in the disciplinary proceeding violated Mr. Heyne's procedural due process rights, (2) that the record does not contain sufficient evidence that the school officials' decision to suspend Mr. Heyne for ten days stemmed from their "bias and partiality" against him, and (3) that the record contains ample evidence to support the school officials' decision that Mr. Heyne's conduct on the afternoon of September 5, 2008 constituted an infraction of Rule 1, Code 8 proscribing reckless endangerment.

## A.

Both the United States Constitution and The Constitution of Tennessee contain substantially similar limitations on the power of government entities to deprive persons of their life, liberty, and property. Section One of the Fourteenth Amendment provides, in part, that the states shall not "deprive any person of life, liberty, or property, without due process of law." Similarly, Article I, Section 8 of the Constitution of Tennessee states that "no man shall be . . . disseized of his freehold, liberties or privileges, or . . . deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." We have repeatedly noted that the procedural due process protections in these two provisions are essentially the

same. *Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d 216, 230 (Tenn. 2010); *City of White House v. Whitley*, 979 S.W.2d 262, 269 (Tenn. 1998); *State ex rel. Anglin v. Mitchell*, 596 S.W.2d 779, 786 (Tenn. 1980); *Daugherty v. State*, 216 Tenn. 666, 675, 393 S.W.2d 739, 743 (1965).

When a person asserts a procedural due process claim, the court must first determine whether he or she has an interest entitled to due process protection. *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 570-71 (1972); *Rowe v. Board of Educ. of City of Chattanooga*, 938 S.W.2d 351, 354 (Tenn. 1996). If the court determines that the person has an interest that is entitled to constitutional due process protection, then the court must determine "what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *see also Martin v. Sizemore*, 78 S.W.3d 249, 263 (Tenn. Ct. App. 2001). Once the court determines minimum procedural due process protections to which the person is entitled, the court must finally determine whether the challenged procedures satisfy these minimum requirements.

Courts must generally look beyond the federal and state Constitutions to determine whether a person has a constitutionally protected property interest. As the United States Supreme Court has noted, these sorts of interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents of State Colls. v. Roth*, 408 U.S. at 577.

The United States Supreme Court has declined to recognize that the right to a free public education is a fundamental right protected by the Equal Protection Clause of the Fourteenth Amendment. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35-36 (1973). However, Article XI, § 12 of the Constitution of Tennessee "guarantees to all children of school age in the state the opportunity to obtain an education." *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 140 (Tenn. 1993). To implement this constitutional imperative, the General Assembly has created a statutory right to a public education that benefits all school-age children in Tennessee.[11] Accordingly, Mr. Heyne has a claim of entitlement to a public education that warrants procedural due process protection.

Having determined that Mr. Heyne has a constitutionally protected right to a public education, the next step is to identify the scope of the minimum due process protections that must be afforded to students like Mr. Heyne when a school undertakes to disrupt this right by disciplining them for misconduct. Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 162 (1951) (Frankfurter, J., concurring). By its very nature, "due

---

[11]*See* Tenn. Code Ann. §§ 49-6-3001(c)(1), -3003 (2009).

process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Rest. Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961). Therefore, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. at 481.

The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see also Bailey v. Blount Cnty. Bd. of Educ.*, 303 S.W.3d at 231. To assure that this requirement is met, both the United States Supreme Court and this Court require consideration of "three distinct factors." *Mathews v. Eldridge*, 424 U.S. at 335; *Smith v. State*, 357 S.W.3d 322, 357 (Tenn. 2011); *Phillips v. State Bd. of Regents*, 863 S.W.2d 45, 50 (Tenn. 1993). These factors include:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 335.

We concur with the United States Supreme Court's observation that students do not shed their constitutional rights at the school house door. *Goss v. Lopez*, 419 U. S. at 574 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)); *see also Morse v. Frederick*, 551 U.S. 393, 396 (2007). However, we also concur with the United States Supreme Court's observation that the contours of a student's rights can be properly defined only by considering the "special characteristics of the school environment," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. at 506), and the significant interest of school officials in controlling the behavior of students to prevent material disruption of class work, to prevent substantial disorder, and to prevent the invasion of the rights of other students or faculty. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. at 513.

The United States Supreme Court has already had occasion to address the procedural due process rights of public school students facing discipline for infraction of rules of student conduct. The case involved nine students who were summarily suspended from school for up to ten days for disruptive or disobedient conduct in the presence of a school administrator. The students filed suit in the United States District Court asserting that their procedural due

process rights were violated because they were denied a hearing of any kind.  A three-judge District Court determined that due process required that, except in emergency situations, students could not be suspended without first being provided notice and a hearing.  *Goss v. Lopez*, 419 U.S. at 571-72.

The United States Supreme Court disagreed with the District Court's assessment of the scope of the students' due process rights and explicitly declined to go any further than requiring "an informal give-and-take between [the] student and [the] disciplinarian." *Gross v. Lopez*, 419 U.S. at 584.  The Court noted that a ten-day suspension is "a serious event in the life of the suspended child," *Goss v. Lopez*, 419 U.S. at 576, and that defining the scope of the students' rights required an "appropriate accommodation of the competing interests involved." *Goss v. Lopez*, 419 U.S. at 579.  While the Court observed that "[s]ome modicum of discipline and order is essential if the educational function is to be performed," *Goss v. Lopez*, 419 U.S. at 580, it stated that "[t]he risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process." *Goss v. Lopez*, 419 U.S. at 580.

After balancing the competing interests of the student and the school, the United States Supreme Court held that in order to guard against unfair or mistaken findings of misconduct or arbitrary exclusion from school, "due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez*, 419 U.S. at 581.  The Court explained:

> We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident.  Brief disciplinary suspensions are almost countless.  To impose in each such case even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness.  Moreover, further formalizing the suspension process and escalating its formality

and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.

*Goss v. Lopez*, 419 U.S. at 583.

We agree with the manner in which the United States Supreme Court has balanced the interests of schools and students facing disciplinary suspensions of ten days or less. While we are obligated to adhere to the Court's determination of the requirements of the Due Process Clause of the Fourteenth Amendment, it is solely our prerogative to determine the procedures that are necessary to satisfy the requirements of Article I, Section 8 of the Constitution of Tennessee. State constitutions may afford greater protections than those found in the United States Constitution and may even protect rights that are not protected by the United States Constitution. *See State v. Cox*, 171 S.W.3d 174, 183 (Tenn. 2005); *Tennessee Small Sch. Sys. v. McWherter*, 851 S.W.2d at 152. In the context of the procedural due process rights of public school students facing discipline for the infraction of school rules, we have determined that the protections afforded by Article I, Section 8 are the same as the protections afforded by the Due Process Clause of the Fourteenth Amendment. Accordingly, we adopt the reasoning and the holding of the United States Supreme Court in *Goss v. Lopez* regarding the due process rights of public school students facing a suspension of ten days or less.

**B.**

Based on our understanding of the record in this case, Mr. Heyne received all of the required due process protections before Mr. Manuel suspended him from school for ten days on September 11, 2008. Had the disciplinary proceeding ended at this point, any claim of a procedural due process violation would have been effectively foreclosed by *Goss v. Lopez*. However, the proceedings did not end with Mr. Manuel's decision to suspend Mr. Heyne for ten days.

The Heynes received a notice dated September 11, 2008, stating that the matter of Mr. Heyne's discipline for violating three provisions of the Student-Parent Code of Conduct and Handbook had been referred to the coordinator of student disciplinary referrals and that "the penalty for the violation may result in a suspension, exclusion and/or expulsion of your son/daughter for more than ten (10) school days." This notice triggered additional statutory rights to further disciplinary hearings. *See* Tenn. Code Ann. § 49-6-3401(c)(4)(A). The Heynes pursued these additional hearings. Their current multi-faceted attack on the Board and the school administrators involves the proceedings that took place after Mr. Manuel suspended Mr. Heyne for ten days.

-18-

While the Heynes have launched a multi-front attack on the MNPS's disciplinary process, they have not asserted that the hearing process mandated by Tenn. Code Ann. § 49-6-3401(c)(4), (6) and the Student-Parent Code of Conduct and Handbook does not satisfy minimum due process requirements. Rather, they have asserted that the manner in which this process was applied in their son's case rendered the proceedings fundamentally unfair in three particulars. We will address each of these particulars.

## C.

The Heynes' first procedural due process claim is that the disciplinary proceedings were fundamentally unfair because of the dual role played by Ms. Perry. They insist that it is fundamentally unfair to permit a MNPS Disciplinary Coordinator, like Ms. Perry, (1) to advise and consult with principals, like Mr. Manuel, regarding the disciplinary infractions that have been committed; (2) to assist in gathering evidence relevant to the alleged infractions; (3) to preside at the hearing board's proceeding regarding these charges; and (4) to participate in the hearing board's deliberations.

Due process entitles students facing discipline for infractions of school rules that could result in a suspension greater than ten days to a hearing "at a meaningful time and in a meaningful manner." *See Mathews v. Eldridge*, 424 U.S. at 333. For a hearing to be "meaningful" in the constitutional sense, it must employ a decision-maker or decision-makers who are unbiased. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) ("observing that "a biased decisionmaker [is] constitutionally unacceptable"); *see also Martin v. Sizemore*, 78 S.W.3d at 264.

Due process does not require all the structural safeguards in administrative and civil adjudicatory proceedings that we have come to expect in criminal proceedings. *See* 2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.9, at 679 (4th ed. 2002). Accordingly, while the separation of investigative, prosecutorial, and adjudicative functions is a hallmark of criminal proceedings, due process does not require the strict adherence to separation of functions in civil matters. *See Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976); 32 Charles A. Wright & Charles H. Koch, Jr., *Federal Practice and Procedure* § 8259, at 469 (2006). Accordingly, some combination of overlapping of functions in an administrative proceeding is not inconsistent with fundamental fairness. *Martin v. Sizemore*, 78 S.W.3d at 264.

While we have not heretofore addressed this question in the context of a school disciplinary proceeding, other courts have determined that due process is not necessarily violated when school officials have overlapping responsibilities with regard to investigating and initiating disciplinary proceedings and then deciding whether an infraction has occurred

and imposing punishment. *Brewer ex rel. Dreyfus v. Austin Indep. Sch. Dist.*, 779 F.2d 260, 264 (5th Cir. 1985); *Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 926-27 (6th Cir. 1988); *see also* 1 Ronna Greff Schneider, *Education Law: First Amendment, Due Process and Discrimination Litigation* § 3:12 (2011). As the United States Court of Appeals for the Eleventh Circuit has noted, "[i]n the school context, it is both impossible and undesirable for administrators involved in incidents of misbehavior always to be precluded from acting as decision-makers." *C.B. ex rel. Breeding v. Driscoll*, 82 F.3d 383, 387 n.3 (11th Cir. 1996).

The record before us demonstrates that Ms. Perry, acting as the MNPS's Disciplinary Coordinator assigned to Hillsboro High School, responded to Mr. Manuel's request for assistance in identifying the infractions that Mr. Heyne may have committed during the after-school incident on September 5, 2008. Ms. Perry and other MNPS staff members identified the three infractions with which Mr. Heyne was charged and also told Mr. Manuel that it would be preferable to address the matter at the district level rather than at the local level.

The record also demonstrates that Ms. Perry was a member of the four-person hearing board that conducted the hearing on September 23, 2008, and that she presided over the hearing. However, the record shows that none of the other three members of the hearing board played any role in the investigation or initiation of the disciplinary proceedings involving Mr. Heyne. While the record also shows that Ms. Perry participated in the hearing board's deliberations and stated her opinion that Mr. Heyne had committed the three infractions with which he was charged, the hearing board eventually found that Mr. Heyne had not committed two of the infractions[12] and determined unanimously that he had committed the "reckless endangerment" infraction.

Clearly, the role Ms. Perry played in the proceeding involving Mr. Heyne combined the functions of prosecutor and decision-maker. However, like the other courts that have addressed the issue of separation of functions in school disciplinary proceedings, we decline to adopt a per se rule that a combination of functions, by itself, is contrary to due process. Accordingly, we hold that the fact that Ms. Perry served a dual role in these proceedings, without more, does not rise to the level of a violation of due process. Therefore, the trial court employed an incorrect legal standard when it held that Ms. Perry's actions amounted to "a combination not permitted by Tennessee law."

---

[12]The hearing board declined to find that Mr. Heyne had driven his automobile in a threatening/assaultive manner in violation of Rule 4, Code 44 or that his conduct amounted to cruelty/abusiveness to a student in violation of Rule 9, Code 66.

**D.**

The Heynes' second procedural due process claim is that the Court of Appeals erred by overturning the trial court's conclusion that Ms. Perry's actions in this case were "motivated by bias and prejudice" against Mr. Heyne. They assert that the record contains sufficient circumstantial evidence to support the trial court's conclusion that "Ms. Perry was influenced in her role as decision maker by her investment in a conviction due to her prosecutorial work, and concerns about litigation and the appearance of favoritism." Like the Court of Appeals, we have determined that the evidence in this case is not sufficient to overcome the presumption that Ms. Perry and the other public officials involved in Mr. Heyne's disciplinary proceeding were carrying out their responsibilities in good faith.

We have already determined that the dual role Ms. Perry played in Mr. Heyne's disciplinary proceedings is not sufficient, by itself, to establish a due process violation. However, a party may succeed with a due process claim if it can present special facts and circumstances demonstrating that the risk of actual bias in a particular proceeding is intolerably high. *Withrow v. Larkin*, 421 U.S. at 58; *Martin v. Sizemore*, 78 S.W.3d at 265. Thus, we must evaluate the evidence presented by the Heynes to determine whether it supports the trial court's conclusion that the risk of bias against Mr. Heyne in this particular proceeding is high enough to rebut the presumption that the school officials were acting in good faith.

The evidence in this record establishes that :

(1)     Mr. Heyne is Caucasian, and Denzel A. is African-American;

(2)     Hillsboro High School, like all other schools, complies with Tenn. Code Ann. § 49-6-3401(h) by compiling statistics regarding student discipline that include demographic factors such as the grade level, race, and gender of the student;

(3)     These reports purportedly show that more African-American students than Caucasian students are disciplined at Hillsboro High School;

(4)     No coaches or adult personnel were present in the parking lot when the September 5, 2008 incident occurred;

(5)     Immediately following the incident, Denzel A. and other students found Mr. Manuel in his office and reported what had occurred;

(6)     Denzel A.'s parents were upset that their son had been injured and reported the incident to law enforcement officials;

(7)     Mr. Manuel conducted an investigation and determined that the appropriate punishment for Mr. Heyne's conduct was a ten-day suspension and forfeiture of his right to bring his automobile on campus;

(8)     Mr. Manuel and members of the MNPS central office staff decided that the final disciplinary decision should be made on the district level rather than on the local school level;

(9)     Following a hearing, a four-person hearing board dismissed two of the disciplinary infractions against Mr. Heyne and found unanimously that his conduct on September 5, 2008 constituted reckless endangerment under the 2008-2009 Student-Parent Code of Conduct and Handbook;

(10)    Following a second hearing, the designee of the Director of Metropolitan Nashville Public Schools upheld the discipline imposed by Mr. Manuel and the hearing board; and

(11)    Based on the recommendation of a subcommittee headed by the chair of the Board of Education, the Board of Education declined to review the Heynes' appeal and allowed the discipline imposed by Mr. Manuel and the hearing board to stand.

The Heynes argued, and the trial court apparently found, that Mr. Heyne was suspended from school for ten days because the school officials were concerned about the appearance that more African-American students than Caucasian students were being disciplined at Hillsboro High School. The circumstantial evidence they presented on this point falls far short of the type of evidence that is required to establish racial animus. The record is entirely devoid of any direct evidence that the school officials had decided that discipline at Hillsboro High School was tainted by racial bias or that they set about correcting the problem by singling out Caucasian students for unwarranted discipline.

While the evidence is undisputed that no coaches or other adult school personnel were present when the September 5, 2008 incident occurred, there is no evidence that Denzel A.'s parents were pursuing a liability claim against the school or otherwise attempting to hold the school liable for Mr. Heyne's actions. The fact that Denzel A.'s parents attempted to initiate criminal proceedings against Mr. Heyne, or may have been seeking damages from the Heynes, is not relevant to the school officials' disciplinary actions. The record contains no

evidence that the school officials and Denzel A.'s parents were acting in concert with regard to this incident.

The fact that Mr. Manuel handled this matter himself rather than delegating it to an assistant principal is not significant. Mr. Manuel was the only administrator on duty when the incident occurred, and Denzel A. and the other students reported the incident directly to him. While assistant principals customarily handle student disciplinary matters, other school officials testified that it is not uncommon for executive principals like Mr. Manuel to take charge of disciplinary proceedings when the circumstances warrant it. In this case, the students complained about Mr. Heyne directly to Mr. Manuel. Mr. Heyne was a prominent member of the student body. His parents were extremely involved with school activities and vigorously defended their son as soon as they were informed about the incident. Under these circumstances, it is not remarkable that Mr. Manuel would take on the responsibility to address the matter rather than delegating it to a subordinate.

Based on this record, the fact that the school officials preferred resolving the matter at the district level rather than the local level does not support an inference that their decision to do so was based on race. The disciplinary offense of reckless endangerment had recently been added to the Student-Parent Code of Conduct and Handbook, and there is evidence of some uncertainty regarding the sort of conduct that the offense should include. Accordingly, it is not remarkable that a school principal would consult with other school officials regarding what the offense entailed or that school officials would deem it preferable to address disciplinary proceedings involving a relatively unfamiliar offense at the district level rather than at the local level.

Finally, this record contains no evidence that the review of this case conducted by the designee of the Director of Metropolitan Public Schools was tainted by racial bias or the fear of potential liability. Likewise, there is no evidence that the Board of Education did not, in complete good faith, fulfill its obligation to review the proceedings to decide whether the discipline Mr. Heyne received was warranted by the facts.

At most, the Heynes assert that by the time the record reached the second tier of administrative review, the school officials had such a vested interest in upholding the discipline that Mr. Heyne did not receive a full and fair review of Mr. Manuel's and the hearing board's decisions. This record simply does not contain sufficient evidence to enable us to uphold such a claim of institutional bias.

The trial court employed an incorrect legal standard when it held that Mr. Heyne's disciplinary proceedings were tainted by bias without taking into consideration the presumption that school officials act in good faith. When that presumption is properly

-23-

applied, the evidence in this case is insufficient to establish the existence of special facts and circumstances demonstrating that the risk of actual bias in Mr. Heyne's disciplinary proceeding was intolerably high.

**IV.**

The Heynes also insist that the Court of Appeals erred by overturning the trial court's conclusion that the school officials acted arbitrarily and illegally. The trial court ruled that the record contains no material evidence to support the school officials' finding that Mr. Heyne's conduct amounted to reckless endangerment under the Student-Parent Code of Conduct and Handbook. However, the Court of Appeals agreed with the school system that the record does contain material evidence to support the hearing board's finding that Mr. Heyne's behavior was reckless and that it amounted to reckless endangerment.

Ascertaining whether a record contains material evidence to support a board's decision is a question of law. *Leonard Plating Co. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 213 S.W.3d at 904. For the purpose of this inquiry, "material evidence" is relevant evidence that a reasonable person would accept as adequate to support a rational conclusion. *Hedgepath v. Norton*, 839 S.W.2d 416, 421 (Tenn. Ct. App. 1992) (quoting *Pace v. Garbage Disposal Dist.*, 54 Tenn. App. 263, 267, 390 S.W.2d 461, 463 (1965)). The amount of material evidence required to support an agency's decision "must exceed a scintilla of evidence but may be less than a preponderance of the evidence." *Leonard Plating Co. v. Metropolitan Gov't of Nashville & Davidson Cnty.*, 213 S.W.3d at 904. Because the sufficiency of the material evidence in a common-law writ of certiorari proceeding is a question of law, the courts must review the record de novo without presuming that the findings are correct. *Lafferty v. City of Winchester*, 46 S.W.3d 752, 759 (Tenn. Ct. App. 2000).

The trial court found that the record contained evidence of recklessness.[13] However, it concluded that the record does not contain material evidence of "the endangerment aspect." Relying on the language of the Student-Parent Code of Conduct and Handbook, the trial court explained that the offense of reckless endangerment includes "the two other elements of substantial risk, and death or serious injury to another person." Accordingly, the trial court found that the record contains "no proof that the risk was substantial [or] that the risk was

---

[13]After reviewing the evidence considered by Mr. Manuel and the hearing board, the trial court observed that "10 of those [witness] statements contain testimony that Christian Heyne's conduct in driving his car that day was careless, headlong, irresponsible and risky. . . . The foregoing testimony, though only fulfills the 'reckless' element of the offense Christian Heyne was charged with."

one of death or serious injury." The trial court also pointed out that the hearing board had concluded that Mr. Heyne did not intend to harm Denzel A.

The Student-Parent Code of Conduct and Handbook defined "reckless endangerment" as conduct "creating a substantial risk of death or serious injury to another person." This definition is entirely consistent with our general understanding of recklessness. We have held that

> [a] person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that [the person's] disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

*Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992); *see also* 8 Tennessee Practice: Tennessee Pattern Jury Instructions – Civil 14.55, at 754 (2011); Tenn. Code Ann. § 39-11-1069(a)(31) (Supp. 2011); Tenn. Code Ann. § 39-11-302(a) (2010). A "reckless" person is generally "fully aware of the risks and may even be trying and hoping to avoid harm." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 924 (2d ed. 1995).

The trial court's decision rests primarily on its appraisal of the nature of the injuries that Denzel A. actually sustained rather than the possible injuries that could have resulted from Mr. Heyne's conduct.[14] Like the Court of Appeals, we have concluded that the trial court's interpretation of the school's definition of "reckless endangerment" is too restrictive. We have also determined that the fact that Mr. Heyne did not intend to harm Denzel A. or any of the other freshman football players does not undermine either Mr. Manuel's or the hearing board's conclusion that Mr. Heyne was reckless. For the purpose of the school's rule, a person can be found to have violated the rule proscribing reckless endangerment if the person is aware of, but consciously disregards, the possibility that his or her conduct may create a substantial risk of death or serious injury to another person.

The risks attendant to abruptly driving an automobile in the direction of a group of teenagers standing in a confined space are obvious. Among these risks is the risk of serious injury or death. The record in this case contains sufficient material evidence to support the conclusion that Mr. Heyne had knowledge of facts that would make the danger obvious to

---

[14]The trial court supported its conclusion by pointing to the emergency room records diagnosing Denzel A.'s injuries as a sprain and contusions and an affidavit from the football team's orthopaedic surgeon stating his opinion that it was highly unlikely that serious injury or death could result from the incident.

anyone in his situation.[15]  Despite obviousness of the risk, Mr. Heyne shifted his automobile from reverse to drive and, without stopping or waiting for the students to move out of his way, drove in the direction of the group of students standing between his automobile and the exit to the parking lot.  Viewing all the evidence available to Mr. Manuel and the hearing board in the manner required in proceedings involving a common-law writ of certiorari, we agree with the Court of Appeals that the record contains material evidence supporting the decision to suspend Mr. Heyne for ten days for engaging in conduct that amounted to reckless endangerment and, therefore, that the trial court erred by concluding that Mr. Manuel and the hearing board acted arbitrarily and illegally by making a decision that was not supported by the evidence.

## V.

As a final matter, the Heynes assert that the Court of Appeals erred by reversing the portion of the trial court's judgment awarding them attorneys' fees and costs.  However, the Heynes concede in their argument, as they must, that a party must prove a violation of its constitutional rights before it is entitled to attorneys' fees.  Because we have determined that the Heynes have failed to prove that Mr. Heyne's constitutional rights were violated in the disciplinary proceeding that resulted in his ten-day suspension from school, we affirm the decision of the Court of Appeals that the Heynes are not entitled to recover their attorneys' fees or costs.

## VI.

We affirm the judgment of the Court of Appeals and remand the case to the trial court for any further proceedings that may be required consistent with this opinion.  We tax the costs of this appeal to William and Robin Heyne and their surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUSTICE

---

[15] *See* Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 2 cmt. c (2010) (noting that the definition of "recklessness" in Section 2(a) "requires that the person either have knowledge of the danger or have knowledge of the facts that would make the danger obvious to anyone in the actor's situation").