# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### September 19, 2013 Session

# QUENTIN LINK, A MINOR, BY NEXT FRIEND & LEGAL GUARDIAN, ET AL. v. METROPOLITAN NASHVILLE BOARD OF PUBLIC EDUCATION

**Appeal from the Chancery Court for Davidson County**
**No. 111247II      Carol L. McCoy, Chancellor**

---

**No. M2013-00422-COA-R3-CV - Filed December 19, 2013**

---

Mother of a third-grade student filed a common-law writ of certiorari seeking judicial review of school board's decision to uphold a semester long expulsion of her child. The child was considered disabled due to his diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD") and was provided with an Individualized Education Program ("IEP") as required under the Individuals with Disabilities Education Act ("IDEA"). Mother argues that the school board was without authority to expel her child and that the school failed to appropriately administer his IEP which caused his misbehavior. After reviewing the record and relevant authorities, we reject Mother's arguments and affirm the trial court's order upholding the expulsion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, M.S., P.J., and RICHARD H. DINKINS, J., joined.

Jonathan H. Wardle, Nashville, Tennessee, for the appellant, Quentin and Iris Link.

Saul Solomon, Lora Barkenbus Fox, and Emily Herring Lamb, Nashville Tennessee, for the appellee, Metropolitan Nashville Board of Public Education.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

Quentin Link attended Harpeth Valley Elementary School ("HVES") from kindergarten through third grade. Throughout his tenure at HVES, Quentin struggled with disciplinary problems and disruptive behavior. He was suspended both in and out of school and was ultimately expelled from HVES at the end of his third grade year. During his third grade year, HVES created an Individualized Education Program ("IEP") for Quentin due to his diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD"). Iris Link, Quentin's mother, appealed the decision to expel Quentin through the administrative appeal process. The decision to expel Quentin was upheld, and Ms. Link filed a petition for common-law writ of certiorari in the chancery court. The trial court upheld the expulsion and this appeal ensued.

*Disciplinary Episodes*

Quentin's behavioral issues began when he entered Kindergarten in 2007. Disciplinary reports during the 2007 to 2008 school year reflect that Quentin engaged in "defiant" behavior and was disruptive in class.[1] In response to a note from Quentin's kindergarten teacher regarding Quentin's behavior, Ms. Link sent a note to school on October 28, 2007 stating, in relevant part, "I am concerned about possible ADHD. I certainly don't want my child labeled or medicated, but if it becomes necessary I will seek medical advi[c]e." On October 20, 2007, the school staff support team ("S-Team"), which was comprised of Quentin's kindergarten teacher, an assessment specialist, and a guidance counselor, met and discussed accommodations and interventions that would be appropriate to help resolve Quentin's behavioral problems. Ms. Link was in attendance at the meeting and signed a document indicating she was in agreement with the proposed S-Team Intervention Plan. On December 11, 2007, the S-Team met to review Quentin's progress; Ms. Link again agreed to the S-Team Intervention Plan.

Quentin's disciplinary problems persisted in the first grade. During his 2008 to 2009 school year, Quentin's teachers described his behavior as "disruptive", "disrespectful", and

---

[1] Fourteen discipline reports were recorded during Quentin's kindergarten year. Specific incidents of misconduct include the following: hitting other students with his lunchbox and shoe; being "disruptive all day, doing his 'own thing'"; refusing to listen and follow directions; crawling under the table; knocking a school box out of another student's hand; spitting on a little girl at his table; kicking furniture in school administrator's office; and refusing to go back into the school after being outside.

"out of control" in the disciplinary reports.[2]  A third S-Team meeting was held on October 28, 2008 at which the HVES principal, Kimberly Halliburton ("Principal Halliburton"), Quentin's first grade teacher, an assessment specialist, Quentin's P.E. teacher, and a guidance counselor were present.  Ms. Link participated in and was in agreement with the S-Team Intervention Plan.  The following interventions were recommended and implemented for Quentin:  special seating arrangements, special assignments with physical movements, a task board to earn privileges, involvement of a guidance counselor as needed, and follow-up with a doctor.

Quentin's disciplinary issues continued in second grade.  During the 2009 to 2010 school year, Quentin continued the same pattern of disobedience.[3]  Quentin's persistent misbehavior led his mother to seek testing at Vanderbilt Children's Hospital.  In a March 26, 2010 report entitled "Medical Follow-Up Evaluation", Dr. Sheryl Rimrodt stated:  "While [Quentin] demonstrates some of the motor coordination immaturity and behaviors (impersistence) often associated with ADHD, these can also be related to other developmental disorders; it is not clear that ADHD is the appropriate diagnosis."  At Ms. Link's request, the school system performed a psycho-educational evaluation of Quentin. In a May 11, 2010 report, school psychologist Terri Ashford, M.A. noted that she observed Quentin in a classroom setting on March 29 and 30, 2010.  Regarding those observations, Ms. Ashford stated, in part:

> Quentin was on task about 40% of the time.  On three occasions, he physically removed himself from the group and stopped working. . . . He displayed four acts of physically impulsive behavior (i.e., hit another student on three different occasions and smashed his face into the wall when lining up to leave the room).

---

[2]  Fourteen discipline reports were recorded during Quentin's first grade year.  Specific incidents of misconduct include the following: refusing to come back into the school building; running from teachers; scooting a chair across the classroom instead of doing work; running in and out of the classroom; refusing to put away money during class and screaming when it was taken away; failing to return from restroom breaks in a timely manner; throwing yarn in the air during class; misbehaving during a fire drill and kicking rocks; kicking his desk; refusing to follow directions; throwing legos during class; and disobeying his teacher.

[3]  Eleven disciplinary reports were recorded during Quentin's second grade year.  One specific instance of misconduct was described as follows:

> terrible behavior with a JA volunteer, standing on a chair, stool, crawling under the table, knocking books and pencils on floor, knocking other students, very disobedient all day, refusing to do any work, bugging classmates to keep them from working

3

Ms. Ashford further opined: "Based upon information obtained from the student, parents and teachers, from behavioral observations, and from psychometric data, this examiner's diagnostic impression is that Quentin does not demonstrate the characteristics of a student with a Learning Disability." On May 11, 2010, Ms. Link signed an "Eligibility Report" stating that Quentin did not presently "meet the standard of any disabilities" and was "not eligible for special education."

The summer prior to Quentin's third grade year, Principal Halliburton and assistant principal, Dr. Kaye Rackard, recommended that Quentin split his school day between two teachers. This change was intended to give Quentin a break in the day, a change of environment, and the opportunity to develop a rapport with two adults. Ms. Link consented to this arrangement and selected Quentin's teachers. Principal Halliburton organized the classroom rosters to be comprised of students who would be able to ignore Quentin's behaviors and/or offer peer support to him.[4]

On July 30, 2010, Quentin returned to Vanderbilt for a follow-up evaluation with Dr. Rimrodt and was diagnosed with "ADHD - combined type" and "adjustment disorder with mixed features of emotional and behavioral disruption." Based on this diagnosis and the scores from his psychological evaluation, the school determined he was eligible for exceptional educational services under the category of "other - health impairments."

In the fall of Quentin's third grade year, HVES created an Individual Education Program ("IEP") for Quentin as required under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Ms. Link was present for the IEP meeting and participated in the development of the IEP. She signed a document indicating, "I have been informed and understand my rights as a parent, and have received a copy of the notice of procedural safeguards." The IEP required several interventions including fifteen minutes of one-on-one time with a special education teacher each day and the development of a personalized behavior plan. The behavior plan, developed on November 12, 2010, instituted a "crisis plan or safety plan" which required a resource teacher to intervene when Quentin's behaviors escalated and became unmanageable in the classroom setting.

On November 3, 2010, HVES entered into a Student Probation Contract with Quentin. The contract stated, in relevant part, "I, Quentin Link, understand that my behavior in the past has not been acceptable and this behavior cannot continue. I also understand that schools are to provide a safe and orderly learning environment, and that I will not be allowed to deny others the right to learn." Quentin also agreed to avoid being referred to the office

---

[4] Principal Halliburton stated that some parents requested that Quentin not be placed in the classroom with their children because the children reported being afraid of Quentin.

for misbehaving, make an honest effort to maintain passing grades, follow all the rules and regulations of the Board of Education, demonstrate a respectful attitude toward classmates, teachers, and school personnel, and comply with directions given by school personnel. Ms. Link, Principal Halliburton, Dr. Rackard, and a child advocate from Tennessee Voices were present to discuss and sign the contract.

During his third grade year, Quentin was suspended both in and out of school for his repeated misbehavior. The following incidents were documented by Principal Halliburton in the HVES Individual Student Discipline Detail Report for the 2010 to 2011 school year:

10/7/2010: "Quentin refused to follow any directions. Was given choices of what he could do. He still refused to follow directions. He was very disrespectful to the teacher."

10/13/2010: "Refused to participate in art class, the previously agreed to consequence for this behavior was 'no free play.' When he realized this, he went into the bathroom and hid."

10/25/2010: "Refused to open textbooks or do any of his work. He pushed a textbook off of his desk and told teacher he did not want to do any work. Crawled around on the floor making noises and throwing things off of his desk."

11/4/2010: "Quentin would not do any work so teacher showed the blue folder (contract) to him and he started to laugh-still doing no work-he proceeded to twirl around on the floor, drum pencils, makers, etc., make noises and disturb others. He refused to go with anyone out of the room to a safe place. Finally Mr. Newman picked him up and carried him to the office. There was a huge struggle."

2/3/2011: "Repeatedly jumping off stage in cafeteria when asked to stop he would laugh and run away. Ran around cafeteria when asked to line up."

2/1/2011: "Would not do anything asked of him. Teacher repeatedly asked him to do work and sit quietly. He refused. Was out of control in the room."

2/4/2011: "Refused to participate and would not follow instructions."

2/4/2011: "Upon leaving the computer lab, my class turned right and Quentin turned left. A peer mentioned to him this was a bad idea and notified me. I

5

waited for him outside the classroom and witnessed him running down the long straight hall. Upon questioning, he indicated that he knew that the class turned right, he heard the peer's warning, but chose to go the opposite way instead. I told him that he could not make up his own rules and to have a seat on one of the many chairs available, while I would get his backpack and coat. He refused to sit down after several requests. A peer gathered his things and gave them to him in the hall. While class was packing up, he came back into the room to chat. I walked him back into the hall and explained that he could not be with us right now due to his choices. I asked again for him to have a seat."[5]

2/17/2011: "Very loud and disruptive. Jumping up and down on the risers, constant verbal and instrumental disruptions, turning away after I would approach him; refused to do a written assignment as a consequece; banging and speaking through the door; a constant distraction to other students' learning."

3/6/2011: "Defiant, refused to obey, tried to go to Mr. Simonson ran to the restroom, had to request office personnel to bring him to the office."

4/15/2011: "Quentin refused to resume TCAP testing after the mid-test break. After several warnings, loss of points to qualify for a pizza party, and proposed alternative testing sites, Quentin continued to be defiant and disruptive."

4/25/2011: "Quentin began the day refusing to follow directions. He began to scream in a peer's ear. She asked him to stop. He refused. Mrs. Sanders asked him to stop and he then began to bang on his desk with pencils. The pencils were removed and he began to drum with his hand. He then crawled under his desk while laughing. Mrs. Sanders asked him to go get a book out of Mrs. Fife's room. He refused but [exited] the room without permission. He began to run back and forth outside the room while laughing. Mr. Simonson was called. Quentin refused to go with him, laughed at him and began to run from him down the hallway. Mrs. Sanders followed behind him attempting to keep him in her sight."

---

[5] In a letter from Ms. Link to the Davidson County School Board, dated June 15, 2011, Ms. Link stated that she reported Principal Halliburton to the school board on February 3, 2011 because "Quentin was not taken to a resource teacher when his behavior was accelerating" in accordance with the IEP. Ms. Link further stated that "the principal has taken things out on Quentin because of her dislike for me."

On May 11, 2011, Quentin was referred to the principal's office three times. The disciplinary report described the incidents as follows:

> 5/11/2011: "Quentin would not cooperate in any way. He refused to work on his project, sit-down, leave other students alone even to acknowledge he was being spoken to."

> 5/11/2011: "When I took them to Art class, he refused to get inside and Mr. Jeffries took over. Then when we were going to recess he again refused to get out of the door, so I seeked [sic] help from Mrs. Young. I took her kids outside with me and she tried to talk to him."

> 5/11/2011: "While passing by a 1st grade class in the hall, Quentin hit 4 1st grade students on the head. He then flicked a third grade student on the arm. Following these incidents he refused to continue walking in line. He then hid from me while I called his name. A 4th grade teacher found him behind a fire door."

As a result of these incidents, HVES suspended Quentin and subsequently gave Ms. Link notice of its intent to expel him for one calendar year. The Notice of Expulsion contained a list of offenses warranting expulsion including alleged violations of Code 8-10 ("willful/persistent violation of school rules"), 74-10 ("other conduct prejudicial to good order"), and 29-10 ("bullying").

*Manifestation Determination[6]*

On May 16, 2011, Ms. Link, Principal Halliburton, two special education teachers, a general education teacher, an assessment specialist, Dr. Rackard, and a child advocate from Tennessee Voices, who was present at Ms. Link's request, attended a Manifestation Determination to discuss whether Quentin's behavior was caused by his diagnosis of ADHD. At the conclusion of the hearing, Ms. Link, and the other school personnel, signed a Manifestation Determination form stating, "Quentin's diagnosis as ADHD does not cause a substantial impact on his consist[e]nt willful disobedience with all adults making requests." Following the hearing, Ms. Link was notified of her right to appeal the expulsion and was sent a document which stated, in pertinent part:

---

[6] "Manifestation determination" is a term used in the IDEA, 20 U.S.C. § 1415(k)(1)(E), which prescribes a procedure to be used by the school for determining whether a child's conduct is a manifestation of the child's disability.

**1. Description of the action proposed or refused by the school system:**
Alternative placements were discussed. Quentin's mother was told she could enroll Quentin in McCann Alternative Learning Center today (5/16/2011) while waiting for homebound services or while deciding if she wished to request an appeal of the expulsion decision. Mrs. Link indicated that she would be unable to provide transportation to and from McCann. An IEP addendum to provide transportation was offered and refused. Mrs. Link did not want to send Quentin to the alternative school since there were 10 days left. Mrs. Link provided documentation from a pediatric physician that Quentin would need homebound services because of his disability of ADHD.

**2. Explanation of why the school system proposes or refuses this action:**
Quentin's non-compliant pattern of behavior after implementation of the IEP continued.

Quentin did not enroll at McCann. Instead, he finished the final weeks of his third grade year in homebound school services.

*Level One Appeal*

Ms. Link appealed the principal's decision to expel Quentin, and the Disciplinary Review Board ("DRB") held a Level One hearing on May 24, 2011. The DRB was comprised of three principals from local schools. On a form completed at the hearing, the "Reason for Appeal" was described as follows: "Ms. Link feels that the punishment is too severe for the alleged violations."[7] Testimony was heard from Discipline Coordinator, Lisa Currie; Principal Halliburton; Dr. Rackard; Quentin's third grade teachers, Connie Sanders and Beth Corona; and Ms. Link. Walter Link, Quentin, and friend of the Link family, Tracy Johnson were also present at the hearing.

After deliberating, the DRB upheld the expulsion based on a finding that Quentin violated Code 8-10 ("willful/persistent violation of school rules") and Code 74-10 ("other conduct prejudicial to good order"). The DRB dismissed the allegation of bullying and modified the expulsion to last one semester rather than an entire school year. The Board also

---

[7] When asked to give a brief reasoning for why she requested the appeal, Ms. Link stated, in her oral testimony at the Level One hearing:

I just feel like things could have been done differently. You know, I was open to suggestions, I was available to the school. I feel like some of the things that are in his IEPs and - - were inadequate. And I don't feel like what he did was enough to have him expelled to an alternative learning center.

requested that, in the event that Quentin returned to the Metro Public School System, he should be given Moderate Intervention Services ("MIS") based on his behavior.

## Level Two Appeal

Ms. Link appealed the decision of the DRB, and a Level Two hearing was held before the School Board Director's Designee on June 7, 2011. Ms. Link, Quentin, Principal Halliburton, Dr. Rackard, and Tracy Johnson were present. On a form entitled "Level Two Discipline Appeal to Executive Director/Director's Designee" the "Reason for Appeal" was described as, "Mom wanted to provide additional information."[8] When asked what relief she sought at the Level Two Hearing, Ms. Link stated that she wanted the expulsion removed from Quentin's record. Ms. Link, Principal Halliburton, and Dr. Rackard testified at the hearing. The Director's Designee affirmed the decision of the DRB and upheld Quentin's one semester suspension.

## Appeal to the School Board

Ms. Link appealed the Level Two decision to the Metro school board. Pursuant to Tenn. Code Ann. § 49-6-3401(b)(6), the board is authorized to "grant or deny a request for a board hearing and may affirm or overturn the decision of the hearing authority with or without a hearing before the board." The board voted to deny the request to hear the case and upheld the one semester suspension, which ran during the fall semester of the 2011-2012 school year.

## Judicial Review

Ms. Link filed a petition for a common-law writ of certiorari on September 12, 2011 alleging that Quentin was "unfairly, improperly and unlawfully expelled." The court held a hearing on August 29, 2012, and by order entered December 14, 2012, the trial court upheld

---

[8] When asked about the reason for her appeal at the Level Two Hearing, Ms. Link testified in part as follows:

> I learned in the last meeting there were other options that could have been given to us. There were other schools that he could have attended. There were - - there was homebound, there were other schools. There were MIS classes. My son had been doing fine up until February. And then in February he got written up, I had a disagreement with Ms. Haliburton. And I called the board hear [sic] and voiced my - - my disagreement with . . . her. And after that it seems that the write ups became quite frequent, almost like he was targeted. . . .

the decision of the school board finding it was supported by substantial and material evidence. Ms. Link appeals the decision of the chancery court.

STANDARD OF REVIEW

After exhausting the elaborate administrative review process for the imposition of student discipline, a parent acting on behalf of her child may pursue judicial review using a common-law petition for writ of certiorari pursuant to Tenn. Code Ann. § 27-8-101. *Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 728 (Tenn. 2012). When reviewing a school official's decisions regarding student discipline, our Supreme Court has opined that "[c]reating a climate conducive to learning and maintaining discipline in public schools between kindergarten and the twelfth grade are not judicial functions." *Id.* at 728-29. Therefore, courts must employ the limited standard of review available under a common-law writ of certiorari to "guard against the risk that the courts might undertake to exercise power that does not belong to them." *Id.* at 728.

Parties using a common-law writ of certiorari to challenge an adverse disciplinary decision of a local school board "have the burden of presenting evidence establishing that the officials (1) exceeded their jurisdiction, (2) followed an unlawful procedure, (3) acted illegally, arbitrarily, or fraudulently, or (4) acted without material evidence to support their decision." *Id.* at 730. Courts may not inquire into the intrinsic correctness of the lower tribunal's decision, *Steward v. Schofield*, 368 S.W.3d 457, 465 (Tenn. 2012); reweigh the evidence, *Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980); or substitute their judgment for that of the lower tribunal. *Harding Acad. v. Metro. Gov't of Nashville & Davidson Cnty.* 222 S.W.3d 359, 363 (Tenn. 2007). "The care and restraint reflected in the limited standard of review available through a common-law writ of certiorari helps to avoid the risk that the courts will be asked to become super school boards insofar as student discipline is concerned." *Heyne*, 380 S.W.3d at 729. In addition, we presume that the decisions of local public school officials were made in good faith. *Id.*

ANALYSIS[9]

_____

[9] Metro argues that this appeal is moot because a ruling in Quentin's favor will have no practical effect on his ability to return to Metro schools. Our Supreme Court has recognized a number of exceptional circumstances that make it appropriate to "address the merits of an issue notwithstanding its ostensible mootness." *City of Memphis v. Hargett*, No. M2012-02141-SSC-R11-CV, ___ S.W.3d ___, 2013 WL 5655807, at *5 (Tenn. Oct. 17, 2013). One such circumstance occurs when the challenged conduct is "capable of repetition and evades judicial review." *Id.* The adverse disciplinary decision complained of in this case—a semester long suspension—is capable of repetition and evades judicial review. *Cf. Heyne*, 380 S.W.3d at 723 (ruling on a case involving a ten-day suspension from high school). We will proceed to address the appeal on its merits.

Ms. Link presents two issues for our review. First, she asserts the trial court erred in upholding Quentin's expulsion because the school board lacked authority to expel (rather than suspend) Quentin for "conduct prejudicial to good order." Second, she argues that it is illegal to expel an elementary school student for conduct prejudicial to good order where the student has been diagnosed with ADHD and the school did not follow the IEP. We will address these contentions in turn.

*I. Authority to Expel for Conduct Prejudicial to Good Order*

Ms. Link argues that Quentin's expulsion "violated the statutory authority granted by the Tennessee Legislature." She focuses her argument on a distinction between suspension and expulsion. In support of her contention, Ms. Link cites to Tenn. Code Ann. § 49-6-3401(a) which authorizes suspensions as follows:

> Any principal, principal-teacher or assistant principal of any public school in this state is authorized to suspend a pupil from attendance at the school including its sponsored activities, or from riding a school bus, for good and sufficient reasons. Good and sufficient reasons for suspension include, but are not limited to:
> . . .
> (13) Any other conduct prejudicial to good order or discipline in any public school . . . .

Ms. Link goes on to cite Tenn. Code Ann. § 49-6-3401(g) which provides that a student can be expelled for one calendar year for offenses such as bringing firearms or drugs to school. Ms. Link posits that because Tenn. Code Ann. § 49-6-3401(a) uses the word "suspend" rather than "expel" a principal does not have authority to expel a student for the offenses enumerated in that section. We disagree.

Tennessee Code Annotated section 49-6-3401(g) goes on to state that "[d]isciplinary policies and procedures for all other student offenses, including terms of suspensions and expulsions, shall be determined by local board of education policy." Metro publishes its disciplinary policies and procedures in a "Student-Parent Code of Conduct & Handbook" ("Code of Conduct"). The Code of Conduct adopted for the 2010-2011 school year included a section entitled "Disruption of School - 24-10 Violation of School Rules" which states, in relevant part as follows:

> This category comprises misbehavior that violates school policy. A student will not use violence, force, noise, coercion, threat, intimidation, fear, passive resistance, or any other conduct to cause the disruption, interference or

11

obstruction of any school purpose. Neither will a student engage in such conduct nor will a student help to cause others to engage in such conduct which causes, or which can reasonably be foreseen to cause an unsafe environment, disruption, interference or obstruction of any school purpose. . . .

The following additional violations could result in suspension *and/or expulsion*.

01-10 Cutting class
02-10 Truancy
03-10 Trespassing
*08-10 Conduct prejudicial to good order*
09-10 Inappropriate dress
16-10 Improper use of a cell phone
55-10 Possession of drug paraphernalia
59-10 Under Influence drug/drug-like
60-10 Use/possession/distribution RX drug
61-10 Inhaling substance as drug
70-10 Display/possession gang symbols
71-10 Gang recruiting/initiation
*74-10 Repeated Violations*
75-10 Off-Campus Behavior
76-10 Inappropriate use of internet, cellphones, or other electronic devices
78-10 Tardy to school/class

(Emphasis added). The Code of Conduct expressly allows for the expulsion of a student as a disciplinary consequence of engaging in behavior characterized as "conduct prejudicial to good order" or for "repeated violations."

Ms. Link does not argue that Quentin's behavioral episodes do not constitute "conduct prejudicial to good order" or "repeated violations." Indeed, the record reflects that Quentin was suspended in and out of school eight times during his third grade year and was written up for disciplinary infractions approximately fifty-five times from kindergarten through third grade. Quentin was repeatedly disruptive in class and created a safety dilemma for his teachers when he ran in and out of classrooms and refused to follow directions. There is material evidence to support the board's finding that Quentin repeatedly violated school rules

12

and engaged in conduct prejudicial to good order. Moreover, the Code of Conduct authorized the board to expel students for these behaviors.[10]

## II. Implementation of IEP

Ms. Link argues that Quentin's behavioral problems were linked to his disability and that it was unlawful for the school board to expel Quentin because HVES failed to follow the requirements of his IEP. Metro argues that Ms. Link is estopped from raising these issues due to her failure to exhaust administrative remedies.

As a student with a disability and an IEP, Quentin was afforded certain procedural protections under the IDEA. Therefore, we begin our analysis by examining the scope, purpose, and procedural safeguards of the IDEA.

The primary purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")]." 20 U.S.C. § 1400(d). The primary mechanism for assuring that a disabled student receives a FAPE is the creation of an IEP. An IEP provides an individualized instruction plan for the student that is tailored to meet the needs created by his or her disability. 20 U.S.C. §§ 1401(14); 1414(d). To achieve the purpose of the IDEA, federal funds are provided to states[11] that "meet certain requirements, including the establishment of procedural safeguards designed to give a parent notice and the opportunity to be heard when the parent believes his or her child has been denied rights secured by the IDEA." *Sabaski v. Wilson Cnty. Bd. of Educ.*, M2010-00872-COA-R3-CV, 2010 WL 5289798, at *2 (Tenn. Ct. App. Dec. 17, 2010) (citing 20 U.S.C. §§ 1412, 1415). A parent who wishes to challenge any matter relating to the provision of a FAPE may request an "impartial due process hearing." 20 U.S.C. § 1415(f). Parties aggrieved by decisions made during the administrative process may bring a civil action under

---

[10] In addition, Tenn. Code Ann. § 49-2-203 states:

(a) It is the duty of the local board of education to:
. . .
(7) Suspend, dismiss or *alternatively place* pupils, when the progress, safety or efficiency of the school makes it necessary or when disruptive, threatening or violent students endanger the safety of other students or school system employees

(Emphasis added). Following the Manifestation Determination Hearing, the HVES faculty proposed an alternative placement for Quentin at McCann Alternative Learning Center. Ms. Link refused the alternative placement even though transportation to the learning center was offered.

[11] Tennessee has enacted special education statutes similar to the IDEA. *See* Tenn. Code Ann. §§ 49-10-101–49-10-1307.

the IDEA. 20 U.S.C. § 1415(i)(2). "A plaintiff must exhaust his or her administrative remedies before bringing suit under the IDEA in federal or state court." *Sabaski*, 2010 WL 5289798, at *2 (citing *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 936 (6th Cir. 1989)); *see also* 20 U.S.C. § 1415(l) (stating "before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted"); *S.E. v. Grant Cnty. Bd. of Educ.*, 544 F.3d 633, 642 (6th Cir. 2008) ("'when a plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies, exhaustion of those remedies is required'"). Claims under IDEA are "initially best addressed by educational professionals through the administrative process." *S.E.*, 544 F.3d at 643.

The IDEA does not eliminate a school's ability to discipline disabled students for their misbehavior. 20 U.S.C. § 1415(k)(1). Pursuant to the IDEA, if a child with a disability is removed from the classroom for longer than ten consecutive days for a disciplinary reason, the school must conduct a manifestation determination to determine whether the behavior requiring discipline resulted from the child's disability or whether the behavior is a direct result of a failure to implement the child's IEP. *See* 20 U.S.C. § 1415(k)(1)(E). The procedures for the manifestation determination are outlined in 20 U.S.C. § 1415(k)(1)(E)(i) as follows:

> Except as provided in subparagraph (B), within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the local educational agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine--
>
> (I) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or
>
> (II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.
>
> (ii) Manifestation
>
> If the local educational agency, the parent, and relevant members of the IEP Team determine that either subclause (I) or (II) of clause (i) is applicable for the child, the conduct shall be determined to be a manifestation of the child's

14

disability.

On May 16, 2011, Ms. Link, Principal Halliburton, two special education teachers, a general education teacher, an assessment specialist, Dr. Rackard, and a child advocate from Tennessee Voices, who was present at Ms. Link's request, attended a Manifestation Determination Hearing. At the conclusion of the hearing, a form entitled "Metropolitan Nashville Public Schools Manifestation Determination" was filled out and signed by all who were present at the hearing. The form included the following relevant questions:

- Did the failure to implement any or all parts of the IEP directly result in the student's behavior?

- Did the student's disability cause or have a direct and substantial relationship to the student's behavior?

Both questions were answered in the negative. In addition, the following statement was handwritten on the form: "Quentin's diagnosis as ADHD does not cause a substantial impact on his consist[e]nt willful disobedience with all adults making requests." Ms. Link signed the form and checked a box beside the following statements: "I have been informed of and understand my rights[,]" and "I agree with the manifestation determination decision." In sum, Ms. Link and the HVES administrators agreed that Quentin's misconduct was unrelated to his disability and that his conduct was not a result of the school's failure to implement the IEP.[12] *See* 20 U.S.C. § 1415(k)(1)(E)(i)(I)-(II).

Because the behavior giving rise to the violation of school code was determined not to be a manifestation of Quentin's disability, "the relevant disciplinary procedures applicable to children without disabilities" were able to be applied to Quentin. 20 U.S.C. § 1415(k)(1)(C). Pursuant to 20 U.S.C. § 1415(k)(1)(C), the disciplinary procedures could be

---

[12] On May 17, 2011, Ms. Link was mailed a document which reiterated her right to appeal the manifestation determination. The document stated, in relevant part:

> As parents of a child with a disability, you are entitled to certain procedural safeguards as outlined in the brochure entitled Notice of Procedural Safeguards. Your rights include the right to request a Due Process Hearing or to request mediation if you disagree with the services planned for your child.

> If you have any questions about the information provided, please call Mrs. Halliburton at . . . . We will be glad to answer any questions that you may have concerning the special education services proposed for your child. If you disagree with this decision or need additional information concerning your rights, you may contact the Tennessee Department of Education . . . (by phone) or . . . (fax) or your Regional Resource Center.

applied "in the same manner and for the same duration in which the procedures would be applied to children without disabilities . . . ." HVES proceeded to apply the Code of Conduct to Quentin.

The procedure for appealing the decision rendered at the Manifestation Determination Hearing is different from the procedure for appealing the discipline meted out under the Code of Conduct.[13] The procedural safeguards under the IDEA require an appeal of a manifestation determination to proceed as outlined at 20 U.S.C. § 1415(f). The record shows that Ms. Link did not appeal the manifestation determination by requesting an expedited due process hearing. The issues Ms. Link raises on appeal were squarely addressed at the Manifestation Determination Hearing and relate directly to HVES's obligations under the IDEA. Therefore, to the extent Ms. Link asks this Court to revisit the question of whether Quentin's behavior was a manifestation of his disability or whether the failure to implement or follow the IEP was a cause of his behavior, her claim is barred for failure to exhaust administrative remedies. *See* 20 U.S.C. § 1415(l); *Sabaski*, 2010 WL 5289798, at *2.

CONCLUSION

For the foregoing reasons, the judgment of the chancery court is affirmed. Costs of the appeal are assessed against the appellant.

_____
ANDY D. BENNETT, JUDGE

---

[13] Ms. Link challenged the decision to expel Quentin by requesting Level One and Two Appeals and an appeal to the school board.

16