IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 3, 2005 Session

## JOHN MOORE ET AL. v. METROPOLITAN BOARD OF ZONING APPEALS ET AL.

Appeal from the Chancery Court for Davidson County
No. 03-1011-I (II)     Carol L. McCoy, Chancellor

No. M2004-00353-COA-R3-CV- Filed February 3, 2006

This appeal involves a dispute between the developers of the site of a former commercial laundry and dry cleaning plant located in a residential neighborhood and a group of neighboring residents and property owners. Following two public hearings, the Metropolitan Board of Zoning Appeals approved a mixed-use development that included renovating two of the existing structures and constructing a new structure containing underground parking and additional retail and residential space. The neighboring property owners filed a petition for a common-law writ of certiorari and a writ of supersedeas in the Chancery Court for Davidson County challenging the Board's decision. Following a review of the record of the Board's proceedings, the trial court upheld the Board's decision, and the property owners appealed. We have determined that the Board followed the proper procedures and did not act arbitrarily, and that its decision is supported by material evidence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN, J., joined. PATRICIA J. COTTRELL, J., not participating.

Joseph Howell Johnston, Nashville, Tennessee, for the appellants, John Moore, Gloria McKissack, Arvanzena Clardy, and Juanita Drake.

Thomas V. White, Nashville, Tennessee, for the appellee, Villa Way, LLC.

J. Brooks Fox, Nashville, Tennessee, for the appellee, Metropolitan Board of Zoning Appeals.

## OPINION

### I.

In 1931, White Way Cleaners opened a commercial laundry and dry cleaning plant at the intersection of Edgehill Avenue and Villa Place in the Edgehill section of Nashville. When the City of Nashville enacted its first zoning ordinance two years later in 1933, the plant was zoned industrial even though the surrounding properties were zoned residential. All the property was zoned

residential in the 1960s; however, White Way Cleaners continued to operate its business as a non-conforming use. The property is now zoned RS5.[1]

The original owner sold the laundry and dry cleaning business in 1999, but retained ownership of the real property. In 2002, the owners of the laundry and dry cleaning business decided to build a new plant because it was not feasible to upgrade and renovate the old building. Accordingly, in May 2002, the laundry operations moved to another location, and the old plant was left empty. At this point, the owner of the property began considering various alternatives to develop it.

The property owner first decided to demolish the old plant and shop but later abandoned the idea when he encountered resistance from public officials and other community members. Accordingly, the owner, in conjunction with other partners, prepared a plan for a mixed-use development that would preserve the historic plant and shop and would adapt them for residential, retail, and commercial use. The plan also called for the construction of a three-story parking facility. Two stories of the garage would be below ground, and the third story would contain additional residential or retail space.

As envisioned by the developers, the project would be consistent with the character of the surrounding neighborhood. Their plans for the retail and commercial space included small locally owned stores rather than big box chain developments.[2] They also contemplated external amenities such as sidewalks, landscaping, decorative fixtures, pedestrian bulbs, discrete signage, and adequate security lighting at night. The developers planned to limit the hours of operation for the businesses in order to minimize disruption to the neighborhood.

The developers shared their plans with the area property owners and residents and engaged in lengthy discussions with several community groups.[3] These groups and other individual residents and property owners did not speak with a single voice. While there was a consensus that the existing plant and store buildings should be preserved rather than demolished, there was little agreement regarding the other details of the development. In general terms, the neighborhood groups stated: (1) that they opposed enlarging the existing buildings; (2) that they preferred as much residential use

---

[1] An RS5 district is designed for higher intensity single-family development. It should have good access to either arterial or collector streets. Metropolitan Gov't of Nashville & Davidson County, Tennessee Code § 17.08.020(B)(1)(c) (1998) (Metro. Code). The lot sizes in an RS5 district may be as small as 5,000 square feet. Metro. Code § 17.08.010 (B)(1)(h).

[2] The sorts of businesses contemplated for the development included barber shops, nail salons, banks, fresh produce markets, small professional healthcare offices, coffee shops, sit down restaurants, art galleries, antique shops, flower shops, shoe repair shops, tailor or alteration shops, gift shops, book stores, and child care or elderly care centers.

[3] Two of the most active groups were the Organized Neighbors of Edgehill (O.N.E.) representing the residents of the public housing in Edgehill and Villa-Wedge South Neighborhood Group, Inc. representing the property owners and other residents in the area.

as possible; and (3) that they opposed the construction of the parking facility because they feared environmental problems, blasting damage, and increased traffic congestion.

After attempting to gain consensus for approximately eighteen months, the developers decided to proceed with their plans. One of their first regulatory stops was the Metropolitan Board of Zoning Appeals. The Board's approval of the project was necessary because the developers planned to change the use of the property from one nonconforming use to another and because their plan for the parking structure would require a variance in the rear yard requirements.

The Board held its first public hearing regarding the proposed development on December 5, 2002. After hearing lengthy presentations by the developers, neighbors who spoke both in favor of and against the proposed development, and the member of the Metropolitan Council in whose district the development was located, the Board voted unanimously to defer acting on the development to give the developers and the residents another opportunity to reach a consensus regarding the development.

The Board considered the project again at its February 6, 2003 meeting. The developers stated that the parties had continued to meet and that they had altered the scope of their plans as a result of these meetings. They stated that they had reduced the size of the project and that they now planned to add only 8,800 square feet of new space.[4] They also pointed out that they planned to add 46 new parking spaces and that the development now included a total of 182 parking spaces. Area residents again voiced opposition to the development. Some preferred constructing single family homes, others opposed the construction of the parking garage, and still others insisted that the development was "too big" and "too busy."

At the conclusion of the public comments, the Board determined unanimously, in accordance with Metro. Code § 17.40.650(C)(3)(b) (2005),[5] that the proposed mixed-use development would be more compatible with the surrounding land uses than a commercial laundry and dry cleaning plant. In addition, the Board unanimously approved the parking garage and adding 8,800 square feet to the existing structures. The Board also placed conditions on the development designed to mitigate the impact of the construction and the development on the surrounding properties.[6]

---

[4]The amount of space involved in the project was reduced from 66,300 square feet to 64,800 square feet. The existing buildings contained 56,000 square feet of space.

[5]Metro. Code § 17.40.650(C)(3)(b) states:

> The nonconforming use of a building designed and constructed for nonresidential activities may be changed to another nonconforming use upon a determination by the board of zoning appeals that the new nonconforming use will be more compatible with surrounding land uses than the existing nonconforming use.

[6]The eleven conditions imposed by the Board were: (1) pre- and post-blasting surveys; (2) limitations on the hours of blasting; (3) limitations on the operating hours of restaurants and retail establishments; (4) a prohibition against off-premises liquor sales; (5) quarterly meetings with community groups during the construction; (6) providing residents
(continued...)

The developers' request for a setback variance along the alley was not as successful. While the Board voted 3 to 2 in favor of the request, the Board's rules require four affirmative votes for the approval of a request for a variance. The Board considered the request for a variance at its next two meetings, but no member desired to change his or her vote. Accordingly, the developers' request for a setback variance was deemed denied.

Four property owners filed a petition for a common-law writ of certiorari and a writ of supersedeas in the Chancery Court for Davidson County challenging the Board's approval of the change in the nature and size of the nonconforming use. They asserted: (1) that the Board had employed an unlawful procedure by failing to make specific findings of fact; (2) that the Board acted arbitrarily by failing to require the developers to remediate the toxic contaminants in the ground water beneath the property; and (3) that the record lacked material evidence establishing the project's compliance with Tenn. Code Ann. § 13-7-208(c) (Supp. 2005) and Metro. Code § 17.40.650. The trial court declined to issue a writ of supersedeas and, after examining the record of the proceedings before the Board, upheld the Board's decision. The property owners perfected this appeal.

## II.
### THE STANDARD OF REVIEW

The proper vehicle for seeking judicial review of a decision by a local board of zoning appeals is a petition for a common-law writ of certiorari. *McCallen v. City of Memphis*, 786 S.W.2d 633, 639 (Tenn. 1990); *Hoover, Inc. v. Metro. Bd. of Zoning Appeals*, 955 S.W.2d 52, 54 (Tenn. Ct. App. 1997). This writ permits quite limited judicial review. *Willis v. Tenn. Dep't of Corr.*, 113 S.W.3d 706, 712 (Tenn. 2003); *Powell v. Parole Eligibility Review Bd.*, 879 S.W.2d 871, 873 (Tenn. Ct. App. 1994). The scope of review goes no further than determining whether the entity whose decision is being reviewed exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently,[7] or acted without material evidence to support its decision. *Fallin v. Knox County Bd. of Comm'rs*, 656 S.W.2d 338, 342-43 (Tenn. 1983); *Hutcherson v. Lauderdale County Bd. of Zoning Appeals*, 121 S.W.3d 372, 375 (Tenn. Ct. App. 2003); *421 Corp. v. Metro. Gov't*, 36 S.W.3d 469, 474 (Tenn. Ct. App. 2000).

Judicial review under a common-law writ of certiorari is limited to the record made before the board or agency unless the court has permitted the introduction of additional evidence on the issue of whether the board or agency exceeded its jurisdiction or acted illegally, capriciously, or arbitrarily. *Cooper v. Williamson County Bd. of Educ.*, 746 S.W.2d 176, 179 (Tenn. 1987); *Davison*

---

[6](...continued)
with a contact person for complaints; (7) allocating no less than 30% of the space to residential use; (8) allocating no more than 13% of the space to restaurant use; (9) constructing a wrought iron fence along the alley; (10) constructing an A4 landscape buffer along the alley; and (11) honoring previous agreements with the neighbors.

[7]In the context of proceedings involving a common-law writ of certiorari, illegal, arbitrary, or fraudulent actions include: (1) the failure to follow the minimum standards of due process; (2) the misrepresentation or misapplication of legal standards; (3) basing a decision on ulterior motives; and (4) violating applicable constitutional standards. *Hoover, Inc. v. Metro. Bd. of Zoning Appeals*, 924 S.W.2d 900, 905 (Tenn. Ct. App. 1996).

*v. Carr*, 659 S.W.2d 361, 363 (Tenn. 1983). Reviewing courts will not reweigh the evidence,[8] examine the intrinsic correctness of the decision being reviewed,[9] or substitute their judgment for that of the local officials.[10]

Because a common-law writ of certiorari is an extraordinary judicial remedy, *Robinson v. Traughber*, 13 S.W.3d 361, 364 (Tenn. Ct. App. 1999), it is not available as a matter of right, *Boyce v. Williams*, 215 Tenn. 704, 713-14, 389 S.W.2d 272, 277 (1965); *Yokley v. State*, 632 S.W.2d 123, 127 (Tenn. Ct. App. 1981). Decisions either to grant or to deny the writ are addressed to the trial court's discretion. *Blackmon v. Tenn. Bd. of Paroles*, 29 S.W.3d 875, 878 (Tenn. Ct. App. 2000). Accordingly, the courts review these decisions using the familiar "abuse of discretion" standard. Under this standard, a reviewing court should not reverse a trial court's discretionary decision unless it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003); *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

### III.
#### THE BOARD'S DUTY TO PREPARE FINDINGS OF FACT REGARDING COMPATIBILITY

The residents first assert that the Board followed an unlawful procedure because it failed to make a "detached finding of fact dovetailed to the record." They argue that the absence of findings of fact deprives them of due process because it prevents meaningful appellate review of the Board's decision. We have determined that the Board was not required to make findings of fact with regard to its conclusion pursuant to Metro. Code § 17.40.650(C)(3)(b) that the proposed mixed-use development would be more compatible with the surrounding land uses than a commercial laundry and dry cleaning plant.

We agree with the residents' assertion that findings of fact are helpful and important. In both administrative and judicial proceedings, findings of fact promote an understanding of the basis for the decision. They also help to sharpen the focus of issues raised on appeal. *See B & B Enters. of Wilson County, LLC v. City of Lebanon*, No. M2003-00267-COA-R3-CV, 2004 WL 2916141, at *3 (Tenn. Ct. App. Dec. 16, 2004) (No Tenn. R. App. P. 11 application filed). But as helpful as findings of fact might be in an administrative proceeding, administrative bodies such as the Board are not required to make specific findings of fact unless a statute or ordinance requires them. *Weaver*

---

[8] *Watts v. Civil Serv. Bd. for Columbia*, 606 S.W.2d 274, 277 (Tenn. 1980); *Case v. Shelby County Civil Serv. Merit Bd.*, 98 S.W.3d 167, 172 (Tenn. Ct. App. 2002); *Hoover, Inc. v. Metro. Bd. of Zoning Appeals*, 924 S.W.2d at 904.

[9] *McCord v. Nashville, C. & St. L. Ry.*, 187 Tenn. 277, 294, 213 S.W.2d 196, 204 (1948); *Littles v. Campbell*, 97 S.W.3d 568, 571 (Tenn. Ct. App. 2002); *Hall v. McLesky*, 83 S.W.3d 752, 757 (Tenn. Ct. App. 2001)

[10] *421 Corp. v. Metro. Gov't*, 36 S.W.3d at 474; *Whittemore v. Brentwood Planning Comm'n*, 835 S.W.2d 11, 15 (Tenn. Ct. App. 1992).

*v. Knox County Bd. of Zoning Appeals*, 122 S.W.3d 781, 785 (Tenn. Ct. App. 2003). Metro. Code § 17.40.650 does not require the Board to make findings of fact when it is called upon to determine whether a proposed nonconforming use will be more compatible with surrounding land uses than the existing nonconforming use.

The residents insist, however, that the absence of findings of fact in this case, even if not required by statute or ordinance, deprived them of due process because it impairs appellate review of the Board's compatibility decision. This is not the case here. All parties knew that the single most pivotal issue in this proceeding was whether the proposed development was more consistent with the surrounding land uses than the old laundry and dry cleaning plant.[11] No one who testified at the Board's two hearings took the position that the proposed mixed-use development was less compatible with the surrounding area than the laundry and dry cleaning plant had been. In fact, all agreed that the proposed development was more compatible. The disagreement stemmed from the residents' insistence on a development that would be, at least in their opinion, even more compatible than the one proposed.

Metro. Code § 17.40.650(C)(3)(b) does not require the Board to determine whether a proposed development is the most compatible development possible. Rather, it requires the Board to determine whether the proposed development is more compatible than the existing one. The evidence in this case supports only one conclusion – that the proposed mixed-use development was more compatible with the surrounding land uses than the old laundry and dry cleaning plant had been. Therefore, our ability to review the evidentiary support for the Board's conclusion has not been impaired by the fact that the Board did not make findings of fact supporting its conclusion regarding the compatibility of the proposed development.

## IV.
### THE BOARD'S ERRONEOUS CITATION TO METRO. CODE § 17.40.660

The residents also insist that the Board acted arbitrarily by failing to use the correct standard for approving the requested change and expansion in the currently non-conforming use. They assert that the citation to Metro. Code § 17.40.660 in the Board's February 13, 2003 order reflects the Board's choice of an inapplicable legal standard. We disagree. When viewed in the context of the entire record, the Board's citation to Metro. Code § 17.40.660 represents nothing more than a typographical error.

Metro. Code § 17.40.650 provides the standards for deciding whether to permit the continuation, expansion, or change of a nonconforming use. Metro. Code § 17.40.660 provides similar standards for nonconforming structures. There are significant, self-evident differences between nonconforming uses and nonconforming structures.

_____

[11]One of the Board members, R. Claybourne Petrie, Jr., explained: "The test is really compatibility. . . . [T]he test is, is the new use more compatible with the neighborhood that the old use that's going away. In other words, in this case, is restaurant, retail, office more compatible than the laundry facility."

-6-

The Board's February 13, 2003 order recites that the "appellant [the developer] HAS established to the satisfaction of the Board, that the proposed changes comply with 17.40.660." However, when this statement is considered in the context of the entire order, it is clear that the reference to "17.40.660" should have been a reference to "17.40.650." The order states that the Board was considering an application "requesting a change and enlargement of a non-conforming use." A majority of the hearings focused on the proposed uses of the property, not on whether any structure currently on the property was nonconforming. Most of the conditions the Board placed on the development related to the use of the property, not any structure on the property. Accordingly, it is plain that the person preparing the February 13, 2003 order for the Board simply made a typographical error by typing "17.40.660" instead of "17.40.650." Such a plain and obvious error does not require a remand to the Board for further proceedings. At most, it calls for the Board simply to correct its February 13, 2003 order nunc pro tunc.

## V.
### THE BOARD'S DISPOSITION OF THE RESIDENTS' NUISANCE ISSUES

The residents also argue that the Board followed unlawful procedures by failing to make specific findings of fact regarding the nuisance claims they raised in accordance with Tenn. Code Ann. § 13-7-208(c) and by arbitrarily refusing to address their concerns about the potential nuisances that could arise from the construction and operation of the proposed development. Even though the trial court did not address this issue in its memorandum and order,[12] we will address it here rather than remanding it for further consideration. We have determined that the manner in which the Board addressed the residents' nuisance concerns was appropriate.

### A.

During the two days of hearings before the Board, the residents expressed their concerns and presented evidence regarding potential nuisances that could be caused by the construction of the planned improvements on the property or by the commercial activities that might take place at the development once it is constructed. Specifically, they expressed concerns about: (1) the blasting during the construction of the improvements; (2) the risk of environmental contamination caused by disturbing the tetrachlorethylene and other toxic substances left in the ground as a result of the operation of the laundry and dry cleaning facility; (3) the increased traffic in the area caused by the parking garage; and (4) the possible disruption of the neighborhood caused by the patrons of the restaurants or other commercial establishments.

---

[12]The trial court declined to address the residents' Tenn. Code Ann. § 13-7-208(c) claims, at least in part, because they "did not assert this argument at the time of the hearing on this matter." It is unclear whether the trial court is referring to the administrative hearing before the Board or the November 12, 2003 hearing in the trial court. We have carefully reviewed the record and have determined that the residents raised their Tenn. Code Ann. § 13-7-208(c) nuisance claims during the Board's hearings, in paragraphs 12, 17, and 20 of the Verified Second Amended Petition for Writ of Certiorari, and at the outset of the November 12, 2003 hearing in the trial court.

The Board responded to these concerns in several ways. First, it pointed out that the potential blasting problems could be addressed technically and included conditions in its approval of the project specifically intended to address the residents' blasting concerns.[13] Second, the Board conditioned its approval of the development on explicit agreements that had been reached between the developers and the residents regarding the types of commercial establishments in the development, the hours of operation of these establishments, and exterior signage, lighting, and security. Third, while the Board stated that it did not have authority to deal directly with "issues of toxic waste," it pointed out repeatedly that no construction would be permitted to proceed until the developer complied with the applicable state and local environmental restrictions and requirements that were enforced by other agencies.

**B.**

The residents' claim that the Board followed an unlawful procedure is based on Tenn. Code Ann. § 13-7-208(c).[14] They assert that this statute requires the Board to make explicit findings of fact and to devise specific remedies to all potential nuisance concerns that a development might raise. We have determined that the residents are reading too much into Tenn. Code Ann. § 13-7-208(c).

Tenn. Code Ann. § 13-7-208(c) is not addressed just to boards of zoning appeals. It is addressed to all local government land use planning and building authorities. The statute states that existing nonconforming uses cannot be permitted to expand unless the property on which the expansion will occur has sufficient space "to avoid nuisances to adjoining landowners." Thus, boards of zoning appeals must initially determine that the property is large enough to accommodate the proposed expansion. However, a board's determination that the property can appropriately accommodate a proposed expansion is not a guarantee that the property owner will not create a nuisance during the construction of the project. The responsibility for assuring that a nuisance is not created or for abating a nuisance rests with other governmental agencies.

The Board's recorded deliberations reflect its conclusion that the proposed development was not a nuisance per se and that it would be compatible with the surrounding neighborhood once it was completed. The Board also determined that the proposed development could be constructed without creating a nuisance. Thus, contrary to the residents' assertions that the Board turned a deaf ear to their nuisance concerns, the record demonstrates convincingly that the Board acted to the fullest extent of its power to address the residents' stated nuisance concerns. Accordingly, we find that the Board did not act unlawfully or arbitrarily with regard to the residents' nuisance issues.

---

[13]The Board required pre- and post-blasting surveys of all properties within 1,000 feet and limited the hours of blasting from 10:00 a.m. to 12:00 p.m. It also required the developers to meet with the neighborhood groups at least quarterly during the construction phase and to provide the residents with the name and telephone number of a contact person.

[14]Metro. Code § 17.40.640 explicitly incorporates Tenn. Code Ann. § 13-7-208.

## VI.

We affirm the trial court's conclusion that the Board did not act unlawfully or arbitrarily with regard to its approval of the proposed development in this case. We remand this case to the trial court for whatever further proceedings consistent with this opinion may be required, and we tax the costs of this appeal, jointly and severally, to John Moore, Gloria McKissack, Arvanzena Clardy, and Juanita Drake and their surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J.,M.S.