IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 5, 2023 Session

## ROBERT MADDEN ET AL. v. METROPOLITAN BOARD OF FIRE AND BUILDING CODE APPEALS OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

**Appeal from the Circuit Court for Davidson County**
**No. 22C273  Clifton David Briley, Judge**

_____

**No. M2023-00113-COA-R3-CV**

_____

This case concerns the denial of a variance by the Board of Fire and Building Code Appeals of the Metropolitan Government of Nashville and Davidson County, Tennessee ("the Board"). Landowners applied for a building permit to construct an auto repair shop on undeveloped property. The local fire code required new buildings of this type and size to have, *inter alia*, a water source that could supply 180,000 gallons at 1,500 gallons per minute for two hours. The property at issue did not have the requisite water supply. Thus, as a variance to the fire code, the landowners proposed to construct a 20,000-gallon water tank on the property and to install a "dry" fire suppression system inside the building. When their plan was rejected by the fire marshal, the landowners appealed to the Board and asked for approval of a variance. The Board denied the variance request, citing concerns over the safety of people, including firefighters and first responders. The owners then petitioned for a writ of certiorari, arguing that the Board misapplied the law by failing to consider whether strict enforcement of the fire code would result in "manifest injustice." Finding that the Board failed to distinguish the landowners' request for a variance from an appeal, the trial court vacated the Board's ruling and remanded the matter to the Board for review of the variance request. This appeal followed. For the reasons set forth below, we respectfully disagree with the trial court's conclusion, reverse its judgment, and remand with instructions to affirm the decision of the Board.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Wallace W. Dietz, Christopher M. Lackey, and Breanne N. Hataway, Nashville, Tennessee, for the appellant, Metropolitan Board of Fire and Building Code Appeals of the Metropolitan Government of Nashville and Davidson County, Tennessee.

Dominic J. Leonardo, Nashville, Tennessee, for the appellees, Robert and Dannette Madden.

## OPINION

Robert and Dannette Madden ("Petitioners") own and operate RDR AutoWorks, LLC, an automotive repair shop. The business is currently located at 108 Old Trinity Lane in Nashville, Tennessee. In 2019, Petitioners bought property located at 4788 Jennie Brown Lane in Nashville with the plan to construct a new 5,000-square-foot steel building to relocate their business. The property is undeveloped, zoned for industrial use, and lies in the Urban Services District of Nashville.

In 2020, Petitioners applied for a building permit from the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro"). At the time, the Metropolitan Fire Prevention Code ("the Fire Code") required all building premises to have "an approved water supply capable of supplying the required fire flow for fire protection." *See* Int'l Fire Code § 507.1–2 (Int'l Code Council 2012) (emphasis omitted).[1] Based on their building's size and type, Petitioners needed a water source that could supply 1,500 gallons per minute for two hours—a total of 180,000 gallons. *See id.* § B105.

Per the Fire Code, water supplies could be in the form of "reservoirs, pressure tanks, elevated tanks, water mains or other fixed systems capable of providing the required fire flow." *Id.* § 507.1. Petitioners wanted to connect the property to a water main, but the closest was 2,500 feet away, and extending it would cost $280,000. For this reason, Petitioners developed and submitted a fire suppression plan that varied from the Fire Code's requirements: Petitioners proposed a 20,000-gallon water tank outside the building and a "dry suppression" system inside for chemical fires. Petitioners believed this plan was adequate given the property's location and the planned construction type. Moreover, the arrangement would cost less than $90,000.

Petitioners' fire suppression plan, was considered and rejected—first by Fire Plan Examiner Jim Rummage and then by Assistant Fire Marshal Joseph Almon, the latter of whom explained his decision via email:

> Based on the minimum fire-flow requirements listed in Appendix B of the
> 2012 IFC and building construction information provided on the submitted

---

[1] At the time, Metro used the 2012 edition of the International Fire Code. *See* Metro. Gov't Nashville & Davidson Cnty., Tennessee Code § 10.64.010 (Dec. 2019).

plans, the total capacity required to meet manual fire suppression needs is 180,000 gallons. The proposed 20,000-gallon tank is far short of this capacity.

A reduction in the required fire-flow rate is allowed when the building is protected throughout by an NFPA 13 compliant automatic fire sprinkler system. It would be necessary to consult with a Fire Protection Engineer on the design of the sprinkler system to determine the minimum tank capacity required and [if] any additional equipment, such as pump systems, might be required.

Based on the information above, I concur with Mr. Rummage's evaluation of the requirements and do not support the proposed alternative water supply tank as an equivalent to the requirements listed in the fire code.

Assistant Fire Marshal Almon then gave Petitioners three possible solutions to gain approval:

1. Extend water mains to and provide fire hydrant coverage to the property meeting the minimum fire-flow requirement and duration. (1,500 GPM x 2 hours)

2. Install an engineer designed NFPA 13 compliant automatic fire sprinkler system with all components necessary to meet system demand and duration.

3. [Install an o]n-site tank and accessory components of sufficient size and capacity to meet fire-flow demand as noted in IFC Appendix B Section 105.2.

Petitioners appealed the Fire Marshal's decision to the Board and asked for a variance on the ground that a 180,000-gallon tank would cost at least $130,000—approximately four times the cost of the proposed 20,000-gallon tank. Petitioners acknowledged that the Fire Code was intended to protect the safety of first responders and the public. Still, they claimed their plan was "adequate" because the building was to be made mostly of steel, all vehicles would be parked outside while not undergoing repair, and a fire "wouldn't really spread to anywhere else" because their property was between a highway and a vacant lot. Petitioners added that they had "plenty of insurance."

After hearing from Petitioners, board members expressed concern about hazardous materials on the property, and they questioned whether Petitioners' plan aligned with the spirit and purpose of the Fire Code. Chairman Rich McCoy noted that the Board was not "worried about the buildings as much as the people that are in them." Board members also stated that the fire department knew what it needed to fight a fire. In the end, the Board

unanimously voted to deny Petitioners' variance request. The Board sent Petitioners written notice of the denial, stating, "Based on the minimum fire-flow requirements listed in Appendix B of the 2012 IFC and building construction information provided on submitted plans, the total capacity required to meet manual fire suppression needs is 180,000 gallons."

Petitioners then filed a petition for a writ of certiorari in the Davidson County Circuit Court. Petitioners asserted that the Board did not apply the correct standard of review because it did not consider whether enforcement of the Fire Code would result in "manifest injustice." The Board filed the administrative record, including a transcript of the proceedings before the Board. Thereafter, Petitioners filed their brief, and then the Board filed its brief. The trial court held a hearing on the merits on October 5, 2022, during which no other evidence was introduced.

The trial court held that the Board failed to fulfill its duties because it "simply decided whether it would override [the Fire Marshal]'s determination of whether Petitioners met the [Fire Code] requirements" rather than "whether strict enforcement of the [Fire] Code would result in 'manifest injustice.'" In its final order, the court distinguished between "a variance pursuant to Metro Code § 2.80.080" and "an appeal of the [fire marshal's] decision, pursuant to Metro Code § 2.80.090":

> Petitioners' use of language directly from Metro Code § 2.80.080, indicates Petitioners intended the Board to decide the appeal under the review standard it would apply to an applicant seeking a variance.
>
> In this Court's view, it is reasonably deduced from the record that Petitioners desired and sought a variance pursuant to Metro Code § 2.80.080. It is not equally clear, however, the Board also understood this to be the case. The record lacks any indication the Board made a distinction between an appeal of the decision of Asst. Fire Marshal Almon, pursuant to Metro Code § 2.80.090, and a request for a variance, pursuant to Metro Code § 2.80.080, in its deliberations. The Board makes no mention of the language in Metro Code § 2.80.080. Specifically, the Board does not mention "manifest justice" or "spirit and purpose" of the Code in any manner, and the word "variance" is never used by the Board.

.    .    .    .

> From the record, it appears the Board simply decided whether it would override Asst. Fire Marshal Almon's determination of whether Petitioners met the 2012 IFC requirements. The Board's task was broader than that, however. Because Petitioners were seeking a variance, the Board was obligated to consider whether strict enforcement of the Code would result in

"manifest injustice." Thus, this Court holds the Board's decision relies upon a misrepresentation and/or misapplication of legal standards for a variance, amounting to illegal, arbitrary, and/or fraudulent action.

On this basis, the trial court granted the writ and remanded the matter to the Board "for review of the Petitioner's request for a variance, pursuant to Metro Code § 2.80.080."

This appeal followed.

## ISSUES

The Board presents two issues for our review:

1. Did the trial court err by substituting its judgment for that of the Board in finding that the Board misapplied Metro Code § 2.80.080 when it denied Petitioners' variance request after Board members opined that two of the three required elements were not met?

2. Did the trial court err when it failed to determine whether the Board's decision to deny Petitioners' variance request was supported by substantial and material evidence?

## STANDARD OF REVIEW

At issue is the propriety of the Board's decision to deny a variance from the Fire Code's requirement.

Local boards are administrative bodies whose decisions are subject to judicial review by petition for common law writ of certiorari. *See Harding Acad. v. Metro. Gov't of Nashville & Davidson Cnty.*, 222 S.W.3d 359, 363 (Tenn. 2007). A petition for writ of certiorari is "not a vehicle which allows the courts to consider the intrinsic correctness of the conclusions of the administrative decision maker." *State ex rel. Moore & Assocs., Inc. v. West*, 246 S.W.3d 569, 574 (Tenn. Ct. App. 2005). Thus, when reviewing such petitions, "courts may not (1) inquire into the intrinsic correctness of the lower tribunal's decision, (2) reweigh the evidence, or (3) substitute their judgment for that of the lower tribunal." *Id.* (citations omitted). We are limited to "determining whether the board exceeded its jurisdiction, followed an unlawful procedure, acted illegally, arbitrarily, or fraudulently, or acted without material evidence to support its decision." *Harding Academy*, 222 S.W.3d at 363.

When reviewing the sufficiency of the evidence, courts are limited to determining whether there is "substantial and material evidence" in the administrative record. *Harding Academy*, 222 S.W.3d at 363. But, as we have explained before, courts should not apply this standard mechanically:

[A] reviewing court should not apply [the] "substantial and material evidence" test mechanically. Instead, the court should review the record carefully to determine whether the administrative agency's decision is supported by "such relevant evidence as a rational mind might accept to support a rational conclusion." The court need not reweigh the evidence, and the agency's decision need not be supported by a preponderance of the evidence. The evidence will be sufficient if it furnishes a reasonably sound factual basis for the decision being reviewed.

*Jackson Mobilphone Co., v. Tennessee Pub. Serv. Comm'n*, 876 S.W.2d 106, 110 (Tenn. Ct. App. 1993) (citations omitted) (quoting *Clay Cnty. Manor, Inc. v. State, Dep't of Health & Env't*, 849 S.W.2d 755, 759 (Tenn. 1993); *S. Ry. Co. v. State Bd. of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984)).

Illegal, arbitrary, or fraudulent actions include (1) failing to follow minimum standards of due process; (2) misrepresenting or misapplying legal standards; (3) basing a decision on ulterior motives; and (4) violating applicable constitutional standards. *Hoover, Inc. v. Metro Bd. of Zoning Appeals*, 924 S.W.2d 900, 905 (Tenn. Ct. App. 1996). We review the Board's application of law de novo with no presumption of correctness. *See Harding Academy*, 222 S.W.3d at 363.

While findings of fact promote an understanding of the basis of a board's decision, administrative bodies such as the Board do not have to make specific findings of fact unless a statute or ordinance requires them. *See Moore v. Metro. Bd. of Zoning Appeals*, 205 S.W.3d 429, 436 (Tenn. Ct. App. 2006) (citing *Weaver v. Knox Cnty. Bd. of Zoning Appeals*, 122 S.W.3d 781, 785 (Tenn. Ct. App. 2003)). And there was no requirement for the Board to make findings of fact in this case.

**ANALYSIS**

I.

Petitioners maintain that the Board erred because it did not consider whether strict application of the Fire Code would be manifestly unjust. For its part, the Board contends that it did not have to consider that issue because it determined that the requested variance was contrary to "the spirit and purposes" of the Fire Code.[2]

---

[2] The Board's brief raises a second issue: "Did the Trial Court err when it failed to make a determination on whether the Appellant Board's decision to deny Appellee's variance request was supported by substantial and material evidence?" But the Board preempts its own question in a footnote,

Under Chapter 2.08 of the Metro Code, landowners may appeal to the Board when the Fire Marshal rejects "the mode or manner of construction proposed to be followed or materials to be used in the erection or alteration of a building or structure." Metro Code § 2.080.80 (Dec. 2019).[3] As is relevant here, § 2.080.80 allows landowners to appeal a decision of the Fire Marshal when "an equally good or more desirable form of construction can be employed in any specific case." *Id.* Furthermore, **Chapter 2.08 grants the Board authority to "vary** the application of any provision of [the Fire Code] to any particular case," **but only if it finds that "strict enforcement" would** (1) "**do manifest injustice**" **<u>and</u>** (2) "**be contrary to the spirit and purposes of [the Fire Code] or public interest**." *See id.* § 2.08.090 (emphasis added).

Thus, as Chapter 2.08.090 expressly provides, the Board may grant a variance from the Fire Code provided it finds that strict enforcement would do manifest injustice **and** that strict enforcement would be contrary to the spirit and purposes of the Fire Code or public interest. Stated another way, if either factor is not proven, then the Board is without authority to grant the variance.

Here, it is clear from the Board members' questions and stated concerns about the safety of the firefighters, first responders, and others who may be exposed to a fire at Petitioners' property, that the Board found that Petitioners had not proven that strict enforcement would be contrary to the spirit and purposes of the Fire Code or public interest.

The Fire Code's purpose is two-fold: (1) "to establish the minimum requirements consistent with nationally recognized good practice for providing a reasonable level of life safety and property protection from the hazards of fire, explosion or dangerous conditions in new and existing buildings, structures and premises"; and (2) "**to provide safety to fire fighters and emergency responders during emergency operations**." *See* Int. Fire Code § 101 (ICC 2012) (emphasis added). As is relevant here, new buildings must have a "water supply capable of supplying the required fire flow for fire protection." *Id.* § 507.1.[4]

As the parties asking for a variance, Petitioners had the burden to persuade the Board (1) that the 20,000-gallon tank was "equally good or more desirable"; (2) that strict

---

noting that Petitioners did not "contest that there was sufficient and material evidence to support the Board's decision." Thus, we pretermit the issue.

[3] The Board may also "vary the application" of the Fire Code if it finds "the interpretation of the director of codes and/or the metro fire marshal should be modified." Metro Code § 2.080.90. There is no dispute over the Fire Marshal's interpretation in this case.

[4] The only exception in the 2012 IFC is for buildings with "an approved automatic sprinkler system," in which case the Fire Marshal may reduce the required fire-flow rate by up to 75%. *See* 2012 Intl. Fire Code § B105.2. But regardless, "[t]he resulting fire-flow shall not be less than 1,500 gallons per minute . . . for the prescribed duration." *Id.*

enforcement would "do manifest injustice"; and (3) that strict enforcement would "be contrary to the spirit and purposes of [the Fire Code] or public interest." *See id.* § 2.8.080–090. But Petitioners did not develop an argument or present any evidence to show that enforcement of the Fire Code here would be contrary to its spirit and purposes or public interest. *See id.* Instead, they argued that **allowing** the variance would **not be** contrary to the purpose of the Fire Code or public interest.

The Board was not persuaded by this argument for obvious reasons. At the prescribed rate of 1,500 gallons per minute, Petitioners' 20,000-gallon tank would last just over 13 minutes. Yet Petitioners reasoned that this system was "adequate" because their property was located between a vacant lot and a highway in an industrial part of town. Petitioners even pointed out that they had "plenty of insurance." In other words, if it burned, let it burn.

However, multiple board members noted that the Fire Code's purpose is to protect not only buildings but also people including firefighters and first responders. These comments indicate that the Board found Petitioners' plan inconsistent with the spirit and purpose of the Fire Code, and we agree.

## II.

In closing, we wish to address the primary concern of the trial court. That is whether the Board recognized that Petitioners were requesting a "variance" from strict enforcement of the Fire Code rather than "appealing" from the Fire Marshal's interpretation of the Fire Code.

As an initial matter, we note that Chapter 2.80 of the Metro Code provides only one procedural mechanism for relief from an adverse decision of the Fire Marshal—whether based on an alleged misinterpretation of the Fire Code, an alleged misapplication of the Fire Code, or the principal that another form of construction would be equally as good or more desirable:

> Whenever the director of codes administration and/or the metro fire marshal shall **reject or refuse to approve** the mode or manner of construction proposed to be followed or materials to be used in the erection or alteration of a building or structure, or when it is claimed that the provisions of [the Fire Code] **do not apply**, or that an **equally good or more desirable form of construction can be employed** in any specific case, or when it is claimed that the true intent and meaning of [the Fire Code] have been **misconstrued** or **wrongly interpreted**, *the owner of such building or structure . . . may appeal from the decision of the director of codes administration and/or the metro fire marshal to the board of fire and building code appeals*. Notice of appeal shall be in writing and filed within thirty days after the decision is rendered by the director and/or metro fire

marshal. A fee of two hundred and fifty dollars ($250.00) shall accompany such notice of appeal.

Metro Code § 2.8.090.

Accordingly, § 2.80.80 empowers the Board to grant such appeals by varying from the Fire Marshal's enforcement or interpretation of the Fire Code:

> The board of fire and building code appeals, **when so appealed to** and after a hearing **may vary the application** of any provision of [the Fire Code] to any particular case when, in its opinion, [1] the strict **enforcement** thereof would do manifest injustice and would be contrary to the spirit and purposes of [the Fire Code], or public interest, and when [2] in its opinion the **interpretation** of the director of codes administration and/or the metro fire marshal should be modified.

*Id.* § 2.80.080.[5]

At the commencement of the case, Chairman Rich McCoy asked counsel for the parties to "explain to us your hardship and what alternat[ive] means of protection is proposed in lieu of literal code compliance." Then Chairman McCoy recited the applicable fire code requirements for Petitioner's proposed building based on its size and type. He also identified Petitioner's variance request, noting that, rather than having a fire hydrant within 500 feet of the proposed building, Petitioners proposed to install a dry chemical-fire suppression system inside the building and a 20,000-gallon above-ground water storage tank outside. We also find it significant that Petitioners' counsel stated the standard that

---

[5] The trial court erroneously construed Chapter 2.80 of the Metro Code as distinguishing between an "appeal" and a "variance request."

> In this Court's view, it is reasonably deduced from the record that Petitioners desired and sought a variance pursuant to Metro Code § 2.80.080. It is not equally clear, however, the Board also understood this to be the case. The record lacks any indication the Board made a distinction between an appeal of the decision of Asst. Fire Marshal Almon, pursuant to Metro Code § 2.80.090, and a request for a variance, pursuant to Metro Code § 2.80.080, in its deliberations. The Board makes no mention of the language in Metro Code § 2.80.080. Specifically, the Board does not mention "manifest justice" or "spirit and purpose" of the Code in any manner, and the word "variance" is never used by the Board.

Although Chapter 2.80 distinguishes between the Fire Marshal's interpretation and enforcement of the Fire Code, it creates only one method of appeal. *See* Metro Code § 2.80.090.

governs a variance request, that being the standard in Metro Code § 2.80.080 and Board Rule IX.[6]

Later, Board members asked questions related to the variance request. Chairman McCoy asked, "Are there any alternatives with that well? Is there the ability to pump from the well for water service?" Assistant Fire Marshal Almon answered the question, stating that the well on Petitioners' property was "not considered a reliable fire suppressant source."

Then an unidentified Board Member asked if the water for the 20,000-gallon above-ground tank would come from the well. After being advised that it would not, that same Board Member queried: "[I]f you did have a fire, and you expended all of the 20,000 gallons, how are you going to get more water to fill it back up fast? You won't be able to do that. And obviously, if you've got repair work there, you're going to have vehicles that are having volatile material in them, a fuel for fire."

As for the dry chemical system to be installed inside the new building, another Board Member asked: "Is this system better than a water system for putting out these kind[s] of fires?" Assistant Fire Marshal Almon answered that "the dry chemical system, with the amount of agent it has and the duration, would not meet the normal requirements for this size of a structure." Then Board Member Marina Ntoupi asked if there was "an option to upgrade the dry chemical [system] to meet [the] size of this infrastructure." Assistant Fire Marshal Almon answered, "[T]he material that I was presented for the dry chemical system, it does not carry a listing for this type of (inaudible) for an entire building. It's more of a specific purpose extinguishing system, such as for spray [booths or] for basically a smaller defined area."

Admittedly, the Board could have done a better job of clarifying that the hearing concerned a request to vary from the Fire Marshal's **enforcement** of the Fire Code rather than the Fire Marshal's **interpretation** of the Fire Code. Still, Petitioners have the burden to prove that the Board followed an unlawful procedure by treating the appeal for a variance from the Fire Marshal's enforcement as an appeal for a variance from the Fire Marshal's interpretation. *See Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 729–30 (Tenn. 2012) (stating that parties using a common law writ of certiorari to challenge an administrative decision have the burden of presenting evidence showing that the officials, *inter alia*, "followed an unlawful procedure"). And we find that Petitioners failed to establish that the Board followed an unlawful procedure by treating the hearing appeal as one for a variance from the interpretation of the Fire Marshal. In our view, the transcript

---

[6] Board Rule IX mirrors the language in Metro Code § 2.80.080.

from the hearing before the Board reveals that the Board knew that it was considering an appeal for a variance from the Fire Marshal's strict enforcement of the Fire Code rather than an appeal from the Fire Marshal's interpretation of the Fire Code because the Board asked questions to determine whether the variance proposed satisfied the elements of Metro Code § 2.80.080 and, particularly, whether strict enforcement would be contrary to the Fire Code's spirit and purposes. *See* Int'l Fire Code § 101 (Int'l Code Council 2012).[7]

Accordingly, we respectfully disagree with the trial court's conclusion that the Board applied the law incorrectly.

### IN CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed, and this matter is remanded with instruction for the trial court to affirm the decision of the Board. Costs of appeal are assessed against the appellees, Robert and Dannette Madden.

_____
FRANK G. CLEMENT JR., P.J., M.S.

---

[7] As noted earlier, the purpose of the 2012 IFC is two-fold: (1) "to establish the minimum requirements consistent with nationally recognized good practice for providing a reasonable level of life safety and property protection from the hazards of fire, explosion or dangerous conditions in new and existing buildings, structures and premises"; and (2) "to provide safety to fire fighters and emergency responders during emergency operations." 2012 Intl. Fire Code § 101.